UNITED STATES, respondent, *v.* 196 BUFFALO ROBES, ETC., appellants.

INDIANS — *license to trade with — approval.* A party cannot trade with Indians in the Indian country under a license which has not been approved by the commissioner of Indian affairs.

INDIANS — *license to trade with, not transferable.* A license to trade with Indians in the Indian country is a personal privilege to the person therein named, and cannot be transferred to other parties.

INDIAN COUNTRY — *settlements of white men.* Evidence that there are settlements of white men in a certain section of Montana, is not admissible to prove that it is not a part of the Indian country.

MONTANA IS INDIAN COUNTRY. All the country within the limits of Montana Territory is regarded as Indian country, under the laws of the United States regulating trade and intercourse with Indian tribes.

STATUTORY CONSTRUCTION — *repeals by implication.* A statute, passed subsequently to another act which is incompatible with its provisions, repeals by implication the parts of the first act that are inconsistent with it.

STATUTORY CONSTRUCTION — *organic act — Indian intercourse act — rights of settlers.* The organic act creating the Territory of Montana gave permission to people to come to the Territory and bring the necessaries and comforts of life, and thereby repealed that part of the law of the United States which gives agents of the Indian department the power to expel persons from the Indian country, and prevent citizens from bringing within the Territory the necessaries of life.

STATUTORY CONSTRUCTION — *organic act — Indian license.* The organic act does not repeal the law of the United States which requires persons to obtain a license to trade with Indians in the Indian country.

STATUTORY CONSTRUCTION — *treaty with Blackfoot tribe — Indian country.* The fourth article of the treaty made in 1855 between the United States and the Blackfoot tribe of Indians (11 U. S. Stat. 657), makes that portion of Montana in which Camp Cook is situated, the home of the Blackfoot nation, and it is Indian country in the fullest acceptation of the term.

STATUTORY CONSTRUCTION — *organic act* — *rights of Indians.* The first section of the organic act, relating to the rights of Indians in this Territory, protects the rights of person and property, which Indian tribes have acquired under treaties with the United States.

STATUTORY CONSTRUCTION — *treaty with Blackfoot tribe* — *jurisdiction of Territory.* White persons living in the Indian country within the limits of Montana are subject to the laws of this Territory. The clause in the treaty of 1855, which gives the Indians of the Blackfoot nation the exclusive control over a certain region, was adopted to prevent the United States from interfering with the customs and tribal relations of that nation.

STATUTORY CONSTRUCTION — *organic act* — *Indian regulations.* In the proviso of the first section of the organic act, the United States has expressly reserved the right to make regulations respecting the Indians within this Territory.

FORFEITURE OF GOODS IN INDIAN COUNTRY — *license.* Goods were legally seized and forfeited under the laws of the United States, which were traded for in the Indian country in Choteau county, Montana, by persons without any license therefor from the United States.

*Appeal from the Third District, Lewis and Clarke County.*

IN January, 1871, Langler and Carson, the claimants in this action, demurred to the libel of information, and assigned three causes therefor, to wit: That the goods were not seized in an Indian country; that the goods were purchased and procured in a regularly organized county, subject to settlement and occupation by citizens of the United States; and that the libel did not state facts sufficient to constitute a case of forfeiture. This demurrer was overruled by the court, WARREN, J., and claimants excepted.

The cause was tried in March, 1871, by a jury that returned a verdict for the United States. After the evidence for the respondent had been introduced, the claimants filed their motion for a nonsuit, on grounds similar to those assigned in the demurrer. The court, WARREN, J., overruled the same, and claimants excepted.

During the trial the claimants excepted to the rulings of the court in refusing to allow them to prove the contents of a certain license and receipt; and also that the country where the goods were traded for had been settled for several years by the whites; that it was in Choteau county, Montana; that the government was surveying the same into

townships and sections; and that the land office in Helena was receiving filings upon the same from settlers in Choteau county.

Claimants filed their motion for a new trial, which was overruled, in December, 1871, by the court, Wade, J., and claimants appealed. The attorneys stipulated that the case should be tried on its merits as disclosed by the transcript, and waived the notice of appeal and undertaking. The other facts appear in the opinion.

Shober & Lowry, and E. W. Toole and W. F. Sanders, for appellants.

The court erred in overruling the demurrer. Courts take judicial notice of towns, counties, etc. 1 Greenl. on Ev., § 6; Organic Act, § 1. The organic act opened all of Montana Territory to settlement by citizens, with all the rights incident thereto. Organic Act, § 6, relating to legislative power; Acts 1865, 531, § 8, organizing Choteau county.

The information shows that Choteau county is not Indian country. If Choteau county is Indian country, then Helena is, and the property of its citizens is liable to confiscation. Such a doctrine is repugnant to justice and law.

The claimants had procured a license to trade, and the Indian agent, Reed, permitted them to trade under it. 1 Brightly's Dig. 427, §§ 52–54. Claimants acted in good faith under the permit of the superintendent of Indians. Forfeitures are odious in law. Persons acting in good faith, like claimants, should not suffer because officials authorized them to do what they did.

The evidence as to the surveys and settlement of the country, in which the goods were traded for, was competent. Would land be Indian country after a person had entered a quarter section in Choteau county and procured the government title thereto? The law on which respondent relies is not applicable to this case. It relates to an Indian reservation, or a country that is strictly Indian, in which settlements by whites are prohibited by law. 3 Kent's Com., Lecture 51.

If Choteau county is Indian country, within the meaning of the act regulating intercourse between the Indians and whites, courts, merchants and citizens are all trespassers. Spirituous liquors cannot be introduced into the Indian country except through the military department.

C. HEDGES, United States Attorney, for respondent.

The information alleges that the acts complained of were committed in the Indian country in Choteau county. The name of the county was added for local description. County lines were established by the legislature. The organic act expressly reserves the rights of Indians. Organic Act, § 1. It is conceded that this place, where the goods were traded for, is under the control of the Blackfoot nation. The treaty with that tribe has never been extinguished. The legislature of Montana cannot act in the premises. See Treaty, 11 U. S. Stats. 657. Indian country is defined in 1 Brightly's Dig. 427, § 51.

The court properly refused to allow claimants to prove the contents of a license. The license relied on was not valid. It had never been approved by the commissioner of Indian affairs. Regulations War Department, Nov. 9, 1847, § 7. The proof of its contents was immaterial.

The evidence relating to United States surveys and pre-emptions in Choteau county was properly excluded. It could only go to the extent of showing that the government had acted inconsistently with treaty stipulations. The force of such evidence cannot be extended beyond the point of immediate inconsistency. Such evidence, to have any value, must show that the locality, where trading was proved to have been done, had been surveyed and thrown open to pre-emption.

The claimants should have proved that they had a valid license to trade with Indians. In this they failed.

KNOWLES, J.    The facts appearing in the record are that the claimants, Carson and Langler, traded for one hundred and ninety-six buffalo robes, one elk robe, two beaver skins,

one kit beaver, four wolf skins, and one buffalo cow skin, dressed for lodge, at or near a place known as Camp Cook, within the bounds of Choteau county, Montana Territory. That T. C. Powers made application for a license to trade with the Crow Indians, near Camp Cook, of Gen. Sully, the Indian superintendent for the Territory, for himself and McKnight. The license was made out by Sully, but it does not appear that it was ever approved by the Indian commissioner at Washington. It was sent to Parker, who then occupied that position, and by him returned to Viall, the present superintendent of Indian affairs, and by him lost. In this application Langler was named as a trader at Camp Cook. It also appears that McKnight had a license to trade with the Crow Indians at or near Camp Cook, but it does not appear that in this transaction Carson or Langler were acting for him or had any connection with his license. Powers testified as follows : "They (Carson and Langler) procured the goods from me that they traded for the goods described in the information. They were general Indian goods ; no whisky. They were to pay me in furs for the goods they purchased of me, and were bringing them to me at the time they were seized."

The attempt to prove the contents of a license to Powers and McKnight was properly refused. First. For the reason that a license is of no validity to trade with Indians without the approval of the Indian commissioner. See 4 Stats. at Large, 735, § 2, and Regulations of War Department, Nov. 9, 1847.

Second. Because a license to Powers and McKnight, although Langler may have been named therein as a trader, would not have been a sufficient warrant for Carson and Langler to trade with Indians in their own right, as it clearly appears from the evidence of Powers they did. Powers and McKnight could not give them authority to trade under their license. A license gives a personal privilege to those named therein to trade, and the privilege cannot be transferred to others. It does not appear, however, that there was any attempt to do any thing of this kind.

For the same reason as the last named, the court properly excluded the license to McKnight. It was not pretended that Carson and Langler traded under it for McKnight, but for themselves, and they could have received no authority to trade under it for themselves. Neither does it appear that Carson or Langler were named in it as traders. The court properly excluded the evidence of the settlement of white men in the region of country where the trading took place. The question of whether there were one or thirty other white men between Benton and Camp Cook would not determine the point as to whether it was an Indian country or not.

The claimants, then, were trading with the Crow Indians, at or near Camp Cook, and purchased the articles seized from them, and had no license or authority to trade with Indians from the proper department of the government, as required by law, if the country where the trading took place was Indian country.

If the place where the trading occurred was Indian country, then the goods were liable to seizure. If it was not, then they were not. This, then, is the question to be determined — was Camp Cook in what is known in law as the Indian country?

Section 1 of an act to regulate trade and intercourse with Indian tribes, and to preserve peace on the frontiers, reads thus:

"That all that part of the United States west of the Mississippi, and not within the States of Missouri and Louisana or the Territory of Arkansas, and also that part of the United States east of the Mississippi river, and not within any State to which the Indian title has not been extinguished for the purposes of this act, be taken and deemed to be the Indian country." 4 U. S. Stat. at Large, 735, § 1.

All the country embraced within the limits of Montana Territory, according to the provisions of this act, for the purposes of Indian intercourse, must be classed as Indian country. It is claimed by the appellants that the organic act of Montana repealed this law as far as this Territory

is concerned. It does not do so in express terms; it must do so by implication if at all. The law does not favor a repeal of a statute by implication. A subsequent statute to have this effect on a previous one must be wholly inconsistent and incompatible with it. It cannot be possible that both statutes should stand without a palpable conflict between them. If one statute is thus inconsistent with another, then it repeals it by implication. If one statute conflicts with a portion of another so as to exhibit an inconsistency, then the inconsistent portion of the previous statute cannot stand, and is said to be repealed by implication. When two statutes conflict, the subsequent repeals the former by implication only so far as it conflicts therewith.

How, then, does the organic act of this Territory create such a conflict in the Indian intercourse act as to render them so inconsistent and contradictory that they both cannot stand, or that that portion of the Indian intercourse act which requires persons trading with Indians to procure a license must be considered as repealed. It may be true that the creation of a territorial government by that organic act virtually gave permission to people to come here and live; and if persons have permission to come to this Territory and live, they must have, as a necessary result, the right to bring here the necessaries and comforts of life. Hence, that portion of the Indian intercourse act which gives power to the agents of the Indian department to expel persons from the Indian country, and to prevent citizens or others from bringing here the necessaries or comforts of life, must be repealed. But I can see no conflict between these rights claimed under the organic act and the requirements of the government, that those who trade with Indians must have a license therefor. It is not at all necessary to the comfort or happiness, much less the existence of the people of this Territory, that they should have the right to trade with Indians without license. They can enjoy about all of the rights of the citizens of other communities without this right, and hence I am unable to see how our organic act so

conflicts with that law requiring the Indian trader to procure a license.

It is very probable, however, that the portion of country where Camp Cook is situated is Indian country, in the fullest acceptation of the term. In 1855 the government of the United States, through its commissioners, A. Cummings and Isaac I. Stephens, made a treaty with the Blackfoot and a number of other tribes. Article 4 of that treaty reads as follows :

" The parties to this treaty agree and consent that the tract of country lying within lines drawn from the Hell Gate or Medicine Rock Passes, in an easterly direction, to the nearest source of the Muscle Shell river ; thence down said river to its mouth ; thence down the channel of the Missouri river to the mouth of Milk river ; thence due north to the forty-ninth parallel ; thence due west on said parallel to the main range of the Rocky Mountains ; and thence southerly along said mountains to the place of beginning, shall be the territory of the Blackfoot nation, over which said nation shall exercise exclusive control, excepting as otherwise provided in this treaty." See 11 U. S. Stat. at Large, 657, § 4. Camp Cook is within the limits described.

I am unaware that this treaty has ever been abrogated or annulled by the United States. Certainly our organic act does not purport to.

This is a portion of section 1 of our organic act :

" That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribes, is not, without the consent of said tribes, to be included within the territorial limits or jurisdiction of any State or Territory, but shall be excepted out of the boundaries and constitute no part of the Territory of Montana, until said Indians shall signify their assent to the president of the United States to be included within said Territory, or to affect the authority of the United

States to make regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never passed.''

Much may be included under the two heads, rights of person and rights of property. And I think we may safely say, that the right stipulated in this article of the treaty above referred to, which sets apart a particular described country, and provides that it shall be considered that of the Blackfoot nation, over which they shall exercise exclusive control, gives to them a right which this proviso in our organic act was intended to protect. By that treaty the United States government makes that region of country the home of the Blackfoot nation; the place where they have the right to live and pursue their avocations; a region to which the United States, by a long-continued policy in treating with Indian tribes, recognizes that the Blackfoot nation have some right, and which must be extinguished by treaty. The article seventh of the treaty of Cummings and Stevens, above referred to, provides that white men may pass through and live in this country. We are not aware that, by any treaty with the Blackfoot nation, this region of country was to be excluded out of any State or Territory; hence we infer that it must be considered as within the limits of Montana Territory. The whites, then, who live in this region are subject to the laws of this Territory; they are within its jurisdiction.

This may seem to be inconsistent with the terms of that treaty, which gives to the Blackfoot nation the right to exercise exclusive control over that region, except as otherwise provided therein.

It is not to be presumed, however, that the United States intended to give to that people the right to force white men, who might live within the borders of their country, or who were passing through the same, to comply with and adopt their customs and tribal regulations. The United States have always claimed the right to make those who were living in the Indian country amenable to its laws.

Vol. I — 63.

The only thing that was intended then, by this clause in that treaty giving them the exclusive control over that region, was to exclude the right of the United States to interfere therein with the customs and tribal relations of that nation. It may be said, then, that this region of country is that of the Blackfoot nation — an Indian tribe ; and, if there is any such thing as an Indian country in the United States, it must be classed as such.

There is another clause in the proviso in our organic act above referred to, that requires notice. It is that clause which provides that nothing in the act shall be so construed as to affect the authority of the government of the United States to make regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never passed.

Here is a direct reservation of the right to make regulations respecting the Indians within this Territory. The reason why one statute is said to repeal another, by implication, is, because it is held that the legislative body that enacted the subsequent statute must so have intended to do. Here, any intention of congress to annul the laws upon the subject of Indian intercourse is especially controverted, by a reservation of the right to the general government to regulate it.

Camp Cook, then, I consider for the purposes of Indian intercourse with the whites, is Indian country. These goods were traded for in an Indian country, by persons who had no license to trade with them, and, hence, were properly seized.

Judgment of the court below is affirmed with costs.

*Judgment affirmed.*