STATE ex rel. ESGAR, Sheriff, Relator, *v.* DISTRICT
COURT et al., Respondents.

(No. 4,465.)

(Submitted September 22, 1919.    Decided November 6, 1919.)

[185 Pac. 157.]

*Supervisory Control—Prizefighting—Boxing—Kiley Act—Stat-
utes and Statutory Construction — Repeal by Implication—
Constitution—Referendum—Legislation—Presumptions.*

Statutes and Statutory Construction—Repeal by Implication—Rule.
  1.  Repeal of an existing law by a subsequent Act is not to be presumed,
unless the latter is irreconcilably repugnant to or revises the whole sub-
ject matter of the former.
Same—Conflicting Statutes—Repeal by Implication.
  2.  Where one statute conflicts with a portion of another so as to ex-
hibit an inconsistency, the inconsistent portion of the first will be deemed
to have been repealed by the latter by implication.
  [As to statutes giving different powers, privileges and duties, see note
in 88 Am. St. Rep. 296.]
Same—Partial Invalidity—Effect.
  3.  Where a part only of a statute is unconstitutional, and it is pos-
sible to eliminate the invalid portion without destroying the whole stat-
ute, such construction must be adopted.
Prizefighting—Kiley Law—Intent of Act.
  4.  *Held,* that the Kiley law (Chap. 97, Laws 1913) was not intended
to effect a repeal of section 8576, Revised Codes, prohibiting slugging
matches, boxing, *etc.,* but to make boxing a misdemeanor when not con-
ducted in accordance with the rules and regulations of said Act.
Same—Kiley Law—Rejection on Referendum—Effect.
  5.  *Held,* that rejection of the Kiley law (Chap. 97, Laws 1913)
creating a boxing commission, on referendum vote, left section 8576,
Revised Codes, prohibiting slugging matches, boxing, *etc.,* in full force
and effect, even though the former contained no saving clause.
Referendum—Effect on Referable Acts.
  6.  By force of the referendum amendment to the Constitution (Const.,
Art. V, sec. 1), a referable Act does not become finally effective until
the people have exercised their reserved power either by declining to
refer it or by approving or disapproving it at the polls.    (Mr. Justice
Holloway concurring specially.)
Legislation—Amendments—Presumption.
  7.  The presumption obtains that the legislature was aware of the law
relating to a subject in existence at the time it was attempting to
change it.
Referendum—Meaning of Provision.
  8.  The provision of section 1, Article V, of the Constitution, reserving
in the people the right to refer, and to approve or reject, an Act of the
legislature by their ballot, and declaring that in the interim the legisla-
tion shall be in full force and effect, *held* to mean that it is in force and
effect, subject to the will of the people, and that upon disapproval of a

measure it becomes ineffective from the beginning because it lacks the approval of a constitutional branch of the legislative department—the people.   (See concurring opinion of MR. JUSTICE HOLLOWAY.)

Original application by the State, on the relation of Chas. C. Esgar, Sheriff, for writ of supervisory control against the District Court of the Ninth Judicial District in and for the County of Gallatin, and Ben B. Law, Judge thereof.   Motion to quash the writ overruled, and order directing the release of one Richmond Gex from custody annulled.

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for Relator, submitted a brief; *Mr. Woody* argued the cause orally.

*Mr. Walter S. Hartman,* for Respondents, submitted a brief and argued the cause orally.

MR. JUSTICE COOPER delivered the opinion of the court.

Richmond Gex was charged before a justice of the peace of township No. 1 of Gallatin county, on the eighth day of August, 1919, with a violation of section 8576 of the Revised Codes, in having promoted a boxing match in defiance of its provisions.   A trial was had upon that date in the justice's court, judgment of conviction rendered and entered, and a fine imposed upon the defendant therein in the sum of $50.   Upon his refusal to pay the fine, he was committed by said justice to the county jail for the period of twenty-five days, or until the payment of such fine.   In obedience to the direction contained in the commitment, the relator herein took and held Gex in custody until the ninth day of August, when his release was ordered upon a writ of *habeas corpus* by the district court in and for Gallatin county.   On the date last named the relator made return and answer to the writ.   To this return and answer the respondent herein filed a general demurrer, which, upon a hearing, the court sustained, upon the ground that section 8576 of the Revised Codes had been repealed by chapter 97, Acts of the Thirteenth Legislative Assembly, commonly known as the Kiley

law. This Act was passed by the legislative assembly and approved March 14, 1913. Some months later it was, by petition under the referendum provision of Article V, section 1, of the Constitution, referred to the people for their approval or rejection, and, at the general election held on Novembr 3, 1914, was by adverse vote of the people rejected.

The foregoing is a summary of the material matters set forth in the petition and application of the attorney general for the issuance by this court of a writ of supervisory control directed to the district court of the ninth judicial district, in and for Gallatin county, and to the judge thereof, commanding the annulment of the order discharging Richmond Gex from the county jail and from the custody of the relator. To the order by this court to show cause, a motion to quash has been filed, and the dismissal of this proceeding is asked by respondents upon the ground that the petition herein does not state facts sufficient to warrant the issuance of the order to show cause or to require them to answer thereto.

Section 8576 denounces boxing, wrestling or slugging matches, and declares all promoters or participants therein guilty of a misdemeanor. The Kiley law created a commission, confided to it "sole direction, management, and control * * * over all boxing and sparring matches and exhibitions to be * * * held or given within the state." That Act prescribed punishment for its violation, nullified all city and town ordinances governing boxing and sparring, and repealed all Acts and parts of Acts in conflict therewith.

The attorney general, however, insists that section 8576 was not repealed by the passage and approval of the Kiley law, but that both were at the same time in full force and effect, and so continued to be until the rejection of the later Act by the people at the general election held in 1914, and that section 8576 continued to be, and still is, in full force and effect. The respondents' answer to this is that the provisions of the Kiley law (Chapter 97) and of section 8576 are wholly inconsistent and repugnant; that the later Act, when signed by the governor,

went into immediate effect, entirely displaced section 8576, and continued in force until the proclamation of the adverse vote at the referendum election held in November, 1914; that the Kiley law, by its terms, nullified the words in section 8576 condemnatory of boxing, wrestling and slugging matches, and therefore effected its repeal *in toto.* The fallacy of this contention is plain upon the face of both statutes.

By the Kiley law it was merely sought to render boxing contests less offensive to the sensibilities of citizens opposed to prize ring contests, and it in no sense conflicted with the design apparent in section 8576 to prohibit boxing contests and "wrestling and slugging matches." It did attempt to dress boxing with official sanction by empowering a commission to supervise the actions of all persons promoting boxing matches, to require contestants to submit to physical examination, to prescribe the kind of gloves to be worn, and to impose restrictions designed to remove the obnoxious influences frequently attending such affairs; but it left untouched and unaffected the provisions of section 8576 prohibiting wrestling and slugging matches, thereby precluding the inference that it was intended to permit wrestling and slugging matches in any form. To hold otherwise would be to give countenance to repeals by implication.

The reason and philosophy of the general rule against the [1] abrogation of a former statute are that the repeal of any of the provisions of a law is not to be presumed unless irreconcilably repugnant, or the latter revises the *whole* subject matter of the former. This has been the undeviating opinion of this court from the first to the fifty-first volume of the Montana Reports, as expressed in the following cases: *United States* v. *196 Buffalo Robes,* 1 Mont. 489; *Jobb* v. *Meagher County,* 20 Mont. 424, 51 Pac. 1034; *Penwell* v. *County Commissioners,* 23 Mont. 351, 59 Pac. 167; *State ex rel. Hay* v. *Hindson,* 40 Mont. 353, 106 Pac. 362; *State ex rel. Wynne* v. *Quinn,* 40 Mont. 472, 107 Pac. 506; *State ex rel. Eagye* v. *Bawden,* 51 Mont. 357, 152 Pac. 761. See, also, *Breitung* v. *Lindauer,* 37 Mich. 217; *Longlois* v.

*Longlois,* 48 Ind. 60; *State* v. *Taylor,* 2 McCord (S. C.), 483; *State* v. *White,* 49 La. Ann. 127, 21 South. 141.

It is further firmly settled, not only by repeated decisions of this court, as well as those of courts of the highest character [2] throughout the country, but also by the text-writers upon the subject, that "if one statute conflicts with a portion of another, so as to exhibit an inconsistency, then the inconsistent portion of the previous statute cannot stand, and is said to be repealed by implication. When two statutes conflict, the subsequent repeals the former by implication only so far as it conflicts therewith." (*United States* v. *196 Buffalo Robes, supra; State ex rel. Eagye* v. *Bawden, supra; Diver* v. *Keokuk,* 126 Iowa, 691, 3 Ann. Cas. 669, 102 N. W. 542; *Chicago etc. Ry. Co.* v. *McElroy,* 92 Ark. 600, 123 S. W. 771; *Blackwell* v. *State,* 45 Ark. 90; 36 Cyc. 1973, and cases there cited; Sutherland on Statutory Construction, sec. 152; Lewis' Sutherland on Statutory Construction, secs. 247, 355.) The same rule applies with reference to a statute partly unconstitutional. If it is possible [3] to eliminate the invalid portion, without destroying the entire statute, it must be done. (*Hamilton* v. *Board,* 54 Mont. 301, 169 Pac. 729.)

Every piece of legislation is enacted for the purpose of making a change in the law, or for the purpose of better declaring the law, and its operation is not to be impeded by the mere fact that it is inconsistent with some previous enactment. A partial repeal of a statute may be accomplished by a partial repugnancy to another statute—the rule being that the repeal extends only so far as the repugnancy extends, and leaves all the remainder in full force. (*Quinette* v. *St. Louis,* 76 Mo. 402; *County Court* v. *Griswold,* 58 Mo. 199; *Manker* v. *Faulhaber,* 94 Mo. 430, 6 S. W. 372; *Van Rensselaer* v. *Snyder,* 9 Barb. (N. Y.) 308; *Harrington* v. *Trustees,* 10 Wend. (N. Y.) 550; *Dean* v. *Blise,* 5 Beav. 582; *Bowen* v. *Lease,* 5 Hill (N. Y.), 225; *Williams* v. *Potter,* 2 Barb. (N. Y.) 316.)

In *Stadler* v. *City of Helena,* 46 Mont. 126, 139, 127 Pac. 458, the following rule of construction, peculiarly applicable to the

question now under consideration, was quoted with approval by Mr. Justice Holloway: "Where there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, the two should be read together, and harmonized, if possible, with a view to giving effect to a consistent legislative policy; but, to the extent of any necessary repugnancy between them, the special will prevail over the general statute." (30 Cyc. 1151.)

Giving full force and effect to every word of the Kiley law, **[4]** it is indisputable that the only feature of section 8576 sought to be affected by its provisions was that prohibiting boxing in any form, except with soft gloves in a gymnasium, and that purported neither to repeal the prohibitory clause nor change the penalty prescribed for its violation, but only sought to deal with boxing in a "more minute and definite way," by making it a misdemeanor when not conducted in accordance with the rules and regulations prescribed by it. This was in no sense a repeal of any part of that section. (36 Cyc. 1073, 1151.)

Counsel, however, strenuously insist that, notwithstanding the **[5]** rejection of the Kiley law by the referendum vote, section 8576 of the Revised Codes was not thereby resurrected, but is still a dead letter upon the statute book. That was the lower court's holding, and that by the force of section 122 of the Revised Codes, providing: "No Act or part of an Act, repealed by another Act of the legislative assembly, is revived by the repeal of the repealing Act without express words reviving such repealed Act or part of an Act." True, the Kiley law contained no saving clause; but, notwithstanding that fact, that enactment did not render a boxing match any less a misdemeanor than does section 8576, if conducted in disregard of the rules and regulations by which the boxing commission was to be governed in allowing them at all. The inherent lameness of respondents' contention in that regard is rendered still more conspicuous by the language of section 119, expressly disavowing that very thing. That section reads as follows: "Where a section or a

part of a statute is amended, it is not to be considered as having been repealed and re-enacted in the amended form, but the portions which are not altered are to be considered as having been the law from the time when they were enacted, and the new provisions are to be considered as having been enacted at the time of the amendment." The language of this section is simple, and clearly expresses the legislative intent to leave no gap whatever in the statutory law upon any subject. This conclusion is irresistible.

Respondents, however, still contend that the elimination of [6] section 8576 was completely effectuated by the passage and approval of the Kiley law. The Constitution, so far as pertinent here, reads: "But the people reserve to themselves power to propose laws, and to enact or reject the same at the polls * * * independent of the legislative assembly, and also reserve power at their own option, to approve or reject at the polls, any act of the legislative assembly. * * * Any measure referred to the people shall still be in full force and effect unless such petition be signed by fifteen per cent of the legal voters of a majority of the whole number of the counties of the state, in which case the law shall be inoperative until such time as it shall be passed upon at an election, and the result has been determined and declared as provided by law." (Article V, section 1.)

When the people, in the exercise of their legitimate sovereignty, amended the section last quoted above, and took unto themselves power to approve or reject at the polls any Act of the legislative assembly, section 12 of Article VII of the Constitution was in full existence. In express words, section 12 provides that "every bill passed by the legislative assembly shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it, and thereupon it shall become a law." Can it be doubted, then, that by the use of the words in this amendment, "The veto power of the governor shall not extend to measures referred to the people by the legislative assembly or by initiative referendum petitions," the power so to

reject an enactment was intended to be as effectual to annul such Act as a veto of it by the governor? As is aptly said by Judge Denio in the *Matter of Oliver Lee & Co.'s Bank,* 21 N. Y. 9: "When   *   *   *  we are seeking for the true construction of a constitutional provision, we are constantly to bear in mind that its authors were not executing a delegated authority, limited by other constitutional restraints, but are to look upon them as the founders of a state, intent only upon establishing such principles as seemed best calculated to produce good government and promote the public happiness, at the expense of any and all existing institutions which might stand in their way."

In *State ex rel. Hay* v. *Alderson,* 49 Mont., at page 407, Ann. Cas. 1916B, 39, 142 Pac., at page 213, speaking of the referendum clause now under consideration, this court said: "So, too, the referendum, while in political effect a veto, is not such in the sense in which that term is used in our Constitution, and is not an invasion of the executive function. Under it the people proceed toward bills enacted by the assembly, expressing assent or dissent, in essentially the same manner as the senate upon a bill which has passed the house; they are an additional body through which Acts of the legislature must pass in certain cases, and disapproval, when it occurs, is purely legislative."

In *Moulton* v. *Scully,* 111 Me. 422, 89 Atl. 944, construing an initiative and referendum amendment to a Constitution similar to ours, it was held that the design of the initiative and referendum was to make the law-making power of the legislature not final, but subject to the will of the people, in the last analysis, upon the people themselves. This is reaffirmed by all of the justices of the supreme court of that state. (*In re Opinion of the Justices* (Me.), 107 Atl. 673.)

The final claim of respondents is that the effect of the referendum vote was to repeal the Kiley boxing law, and that the repeal of this repealing Act did not have the effect of reviving the conflicting provisions of section 8576 repealed by the Kiley Act. This deduction, to our minds, is wholly unsupported in reason or authority, and in no sense foreshadows the avowed

object derived from the whole constitutional and statutory struc-
ture in question. Indeed, if carried to its logical conclusion,
it would serve to sweep from the statute books every section
of the Code to which an amendment, however slight, were at-
tempted. For instance: The statute of this state provides a
penalty for murder in the different degrees: Section 8293:
"Every person guilty of murder in the first degree shall suffer
death, * * * and every person guilty of murder in the
second degree is punishable by imprisonment in the state prison
not less than ten years." Yet, should the legislative assembly,
in the interest of more substantial justice, see fit to make a
change in that Act—prescribing a lesser penalty for murder in
the second degree under extenuating circumstances—by parity
of the reasoning here, upon a rejection of the amending Act, the
entire section would be annulled, leaving no penalty whatsoever
for murder in the first degree. Consequences so momentous are
not to hang upon a thread of reason so slender. Fortunately
for the peace of society, under well-established rules of construc-
tion we are spared a result so absurd and calamitous. "The
first and fundamental rule in the interpretation of all instru-
ments is," says Mr. Justice Story in his work on the Constitu-
tion, "to construe them according to the sense of the terms and
the intention of the parties. Mr. Justice Blackstone has re-
marked that the intention of the law is to be gathered from the
words, the context, the subject matter, the effects and conse-
quence, or the reason and spirit of the law; * * * that the
effect and consequence of a particular construction is to be ex-
amined, because, if a literal meaning would involve a manifest
absurdity, it ought not to be adopted; and that the reason and
spirit of the law, or the causes which led to its enactment, are
often the best exponents of the words, and limit their applica-
tion." (Sec. 400.)

Sections 119 and 122 were incorporated into our Codes and
had been recognized as living rules of statutory interpretations
for more than ten years prior to the time of the preparation and
submission to the people of this amendment. (*Dowty* v. *Pitt-*

*wood*, 23 Mont. 113, 57 Pac. 727; *State ex rel. Paige* v. *District Court*, 54 Mont. 332, 169 Pac. 1180; *Banks* v. *Yolo County*, 104 Cal. 258, 37 Pac. 900.) These Code sections must, therefore, be held to have been in the contemplation of the framers of that amendment, if not of the people, at the time of its submission to them. For us to now hold otherwise would be to ignore the [7] presumption that a law-making body, in passing laws, acts with deliberation and with full knowledge of all existing ones on the same subject, and intends no interference or abrogation of any prior law relating to the same matter, unless the repugnancy between the two is irreconcilable. (Sedgwick on Statutory and Constitutional Construction, p. 106; Lewis' Sutherland on Statutory Construction, sec. 355; *Bowen* v. *Lease*, 5 Hill, 221; *Canal Co.* v. *Railroad Co.*, 4 Gill & J. 1; *State* v. *Crozier*, 12 Nev. 300.) This we may not do in the circumstances now before us; nor should we by implication hold that the people, in adopting this amendment, overlooked an important piece of its work, and left us in chaos and uncertainty as to what is and what is not the law upon a given subject. It must, therefore, he held that the two Acts could, and did, subsist together until the Kiley law was rejected by the people.

For these reasons, the release of Gex by the district court of Gallatin county, after his conviction and sentence for a violation of section 8576 was wholly unwarranted. The motion to quash is overruled, and the order is annulled.

Mr. Justice Hurly concurs.

Mr. Chief Justice Brantly and Mr. Justice Patten concur in the result.

Mr. Justice Holloway: I concur in the result. Section 1, Article V, of our Constitution, as originally adopted, read: "The legislative power shall be vested in a senate and house of representatives, which shall be designated 'the legislative assembly of the state of Montana.'" In harmony with the policy of that section that a bill duly passed by both houses was subject

to no. further consideration, except by the governor, if the subject matter was within the legislative cognizance, section 12, Article VII, provided: "Every bill passed by the legislative assembly shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it, and thereupon it shall become a law."

Under these provisions the people were without recourse, except at the polls, for any breach of the trust reposed in their representatives. With the introduction of the initiative and referendum in our Constitution in 1906, a different theory of legislation was adopted, and a division of responsibility inaugurated. We are not now concerned with the initiative, and reference to it is omitted.

Section 1, Article V, above, as amended by incorporating the referendum provision, reads as follows: "The legislative authority of the state shall be vested in a legislative assembly, * * * but the people reserve to themselves * * * power at their own option to approve or reject at the polls any Act of the legislative assembly" except certain enumerated measures, of which the Kiley bill was not one. The same section provides that the referendum may be ordered by petition filed with the secretary of state not later than six months after the legislature adjourns, or it may be ordered by the legislature itself. Section 1 provides further: "Any measure referred to the people [by petition] shall still be in full force and effect unless such petition be signed by fifteen per cent of the legal voters of a majority of the whole number of the counties of the state, in which case the law shall be inoperative until such time as it shall be passed upon at an election, and the result has been determined and declared as provided by law."

The theory of the referendum is that the people reserve to themselves the right to determine ultimately upon every referable Act passed by the legislature and approved by the governor, or, in other words, by the referendum amendment the people have constituted themselves potentially a branch of the legislative department of the state government, with respect to every

referable Act, and in fact a branch of that department with respect to every measure actually referred. After the adoption of this amendment, a referable Act never becomes finally effective until the people exercise their reserved power, either by declining to refer it or by expressing their approval or disapproval of it at the polls.

As a matter of public policy, and to prevent the confusion and uncertainty which would follow otherwise, the Constitution [8] declares that, in the interim allowed for the people to act, the legislation shall be in full force and effect; but this means, and can only mean, that it is in force and effect, subject to the will of the people, and that, whenever the people have spoken, and have disapproved the measure, it becomes ineffective from the beginning, not because the people have repealed it, but because it lacks the approval of a constitutional branch of the legislative department.

This question was practically set at rest by the decisions of this court in *State ex rel. Hay* v. *Alderson,* 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210, and in *In re McDonald,* 49 Mont. 454, Ann. Cas. 1916A, 1166, L. R. A. 1915B, 988, 143 Pac. 947. The views there expressed are in harmony with the decisions of courts elsewhere. In *Moulton* v. *Scully,* 111 Me. 428, 89 Atl. 944, it is said: ''The design was to have the legislative power, not final, but subject to the will of the people, a will to be called into exercise by the somewhat complicated machinery of the referendum, * * * the people and not the legislature being the real arbiters of the laws to be finally accepted; that is, the central idea of the change was to confer the law-making power in the last analysis upon the people themselves, a step from representative toward a democratic form of government.''

To give to the amendment the construction contended for by respondents would mean that the people may not invoke its provisions except at the peril of defeating their own purpose. If the Kiley bill was effective for the purpose of repealing section 8576, Revised Codes, then by rejecting it at the polls, the people gave their consent to boxing, wrestling and slugging matches

without any regulation or restriction whatever, although they manifested their disapproval of legalizing boxing in the most emphatic form.

The conclusion we have reached is not altogether logical, but it results in the least of the evils consequent upon any construction which may be placed upon our referendum amendment. It has this virtue: That it leaves the referendum fully vitalized for the purposes for which it was intended, and prevents its misuse to defeat the will of the people.