STATE ex rel. BROWNING, Relator, *v.* BRANDJORD, State Administrator of Public Welfare, et al., Respondents.

(No. 7,803.)

(Submitted March 12, 1938. Decided March 26, 1938.)

[81 Pac. (2d) 677.]

*Mr. J. M. Stotesbury,* for Relator, submitted an original and a supplemental brief, and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Lee Metcalf,* Assistant Attorney General, and *Mr. Clarence Hanley,* Special Assistant Attorney General, for Respondents, submitted an original and a supplemental brief; *Mr. Metcalf* and *Mr. Hanley* argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an original proceeding by a taxpayer seeking an injunction against the State Administrator of Public Welfare and the members of the Public Welfare Board in their official capacities.

By section IV of Part VIII of Chapter 82, Laws of 1937, an appropriation of $2,001,000 was made for administrative costs and other purposes of the Chapter for the year beginning March 2, 1937, and ending March 1, 1938; and a like sum for the same purposes was appropriated for the year beginning March 2, 1938, and ending March 1, 1939. Of this sum $600,-000 was appropriated for the purpose of general relief and contingencies. Various sums of the total for each year were specified for different other relief purposes. The Act author-

ized the board, if necessity arose, to transfer funds from any of these special funds to others.

On February 26, 1938, the board adopted the following resolution: "Mr. Cain moving that the State Administrator be authorized and directed to cause to be issued this day one check in the sum of $150,000.00 payable from the appropriation made for general relief and contingencies, and made payable to the Treasurer of the United States and delivered to Mr. Joseph E. Parker, Administrator of the Works Progress Administration for Montana, in payment for the purchase of materials, equipment, supplies and other non-labor costs on Works Progress Administration projects; the amount of expenditures for such materials, equipment, supplies and other non-labor costs to be considered and used as a sponsor's contribution by the Montana Board of Public Welfare and/or as a co-sponsor's contribution and such contribution to be apportioned among projects operating or to be operated by the Works Progress Administration in the various counties in the state in accordance with agreements between the Works Progress Administrator for the State of Montana and the Montana State Board of Public Welfare."

At the time the resolution was passed, there were sufficient funds unexpended of the appropriation of $600,000 for general relief, so that if the check for $150,000 was issued and paid, a balance would still remain unexpended. The check was drawn pursuant to the resolution, signed but not delivered. This proceeding was brought to enjoin the delivery of the check as contemplated by the resolution.

The cause was heard on the complaint and answer. A reply was filed after the hearing. All parties to the hearing assumed as a premise that the unexpended portion of the appropriation made for the year ending March 1, 1938, after the expiration of that date lapsed or reverted into the general fund from which the appropriation was made. A brief filed after the hearing casts doubt upon the soundness of this assumption. To arrive at such a conclusion, it must be held that Chapter 40 or Chapter 5 of the Laws of 1937 repeals by implication section 304° of the Revised Codes.

We have said of implied repeals, in *Box* v. *Duncan*, 98 Mont. 216, 38 Pac. (2d) 986: "To make tenable the claim that an earlier statute was repealed by a later one, the two Acts must be plainly and irreconcilably repugnant to, or in conflict with, each other; must relate to the same subject; and must have the same object in view. (*State ex rel. Metcalf* v. *Wileman*, supra [49 Mont. 436, 143 Pac. 565]; *Jobb* v. *Meagher County*, 20 Mont. 424, 51 Pac. 1034; *State ex rel. Esgar* v. *District Court*, 56 Mont. 464, 185 Pac. 157; *Equitable Life Assur. Co.* v. *Hart*, 55 Mont. 76, 173 Pac. 1062.)"

In construing statutes asserted to be in conflict, it is the duty of the court to ascertain the true intent of the legislature, if possible, and follow it. Before an implied repeal is declared, the court should make every effort to reconcile the statutes and render every provision of each effective, if possible. (*State ex rel. Nagle* v. *Leader Co.*, 97 Mont. 586, 37 Pac. (2d) 561; *State ex rel. Normile* v. *Cooney*, 100 Mont. 391, 47 Pac. (2d) 637.)

Section 1 of Chapter 40 of the Laws of 1937 provides: "It shall be unlawful for the board of trustees, executive board, managerial staff, president, deans and faculty, or any other authority of any state institution maintained in whole or in part by the state, or for any officer, department, board, commission or bureau, having charge of the disbursement or expenditure of the income provided by legislative appropriation, or otherwise, to expend, contract for the expenditure, or to incur or permit the incurring of any obligation whatsoever, in any one year, in excess of their income provided for such year, or in excess of such income as decreased by the state board of examiners, under and in accordance with the provisions of section 3 of this Act, for such year, or for the state board of examiners, or any supervisory board or authority either directly or indirectly, to authorize, direct or order any such institution, officer, department, board, commission or bureau to increase any expenditures, except as hereinafter provided, and it shall be and is hereby made the duty of any and all of such institutions, officers, departments, boards, commissions and bureaus to keep such expenditures, obli-

gations and liabilities within the amount of such income." The other section of the Chapter provides for a scaling down of appropriations in certain instances by the State Board of Examiners, and when in certain emergencies expenditures in excess of appropriations may be authorized, and penalties for violation of the Act.

Section 1 of Chapter 5 of the Laws of 1937 relates to all state boards, appointed by the governor, among which is the Public Welfare Board. After certain provisions relating to the appointment of deputies and employees for such boards and other departments enumerated, in section 1 of the Act, it is declared: "And provided further that the total expenses of any such office, board, commission, bureau, department or authority of any kind shall not exceed the aggregate during any fiscal year the amount appropriated by the legislature for such fiscal year for such office, board, commission, bureau, department, or authority of any kind."

Section 304 of the Revised Codes provides: "All moneys now or hereafter appropriated for any specific purpose shall, after the expiration of the time for which so appropriated, be covered back into the several funds from which originally appropriated; provided, however, that any unexpended balance in any specific appropriation may be used for either of said years for which such appropriation has been made."

The object of the latter section is to declare when an appropriation reverts. The object of Chapter 40 is to prevent deficiency appropriations. The objects of the two statutes are not the same. At no place is there any mention in Chapter 40 of the reversion of appropriations. It relates not only to appropriations but to all income from any source authorized by law. If a state institution, board or bureau has an appropriation for the first year of the biennium which is not expended, then, if section 304 is still operative, the unexpected portion of the appropriation becomes available by operation of law as an income for the second year, and subject to all of the limitations of Chapter 40. Such a construction does no violence to the objects and purposes of either Act.

The object of the quoted proviso in section 1 of Chapter 5, supra, is to prevent deficiency appropriations. This proviso makes no mention of reversions of appropriations. Thus the object of section 304 is different from that of Chapter 5. Section 304 is a general statute, applying to all appropriations, whereas Chapter 5 applies to none of the appropriations for elective state officers or boards. No reason can be suggested for such classification. Appropriations are made in practice biennially. They may not be made for a longer term than two years. (Sec. 12, Art. XII, Const.) An unexpended portion of an appropriation made for the first year of the biennium, when we apply section 304, becomes a part and parcel of the appropriation for the second year of that period.

Applying the rules of construction referred to supra, neither Chapter 40 nor Chapter 5 repeals section 304 by implication. No reversion or lapse of appropriation occurs until the time specified in section 304, and at the end of the biennium the appropriation lapses, and the unexpended portion remaining reverts to the fund from which it is set apart. Thus the unexpended portion for the first year is available for use by the board here as a part of the appropriation of the second year.

It is the theory of relator's case that the Public Welfare ██ ██ Board was without authority to make disbursements for the purpose set forth in the resolution, and that, even if the authority existed, no valid contract was in existence for which these disbursements were made in discharge of an existing contractual obligation, and, hence, the check, if delivered, would amount to a donation within the provision of section 35, Article V, of the Constitution.

Section III of Part I of Chapter 82 enumerates the powers of the respondent board. Subsection (d) of the section declares: "The state department of public welfare is hereby authorized and it shall be its duty to administer and supervise all federal funds allocated to the state and all state funds appropriated to the state department of public welfare, for the activities and purposes set forth under each part of this Act. The state department of public welfare is also hereby authorized

and it shall be its duty to do all things necessary, in conformity with federal and state laws, for the proper fulfillment of the purposes set forth in this Act.''

Section 1 of Chapter 85 of the Laws of 1937 declares the policy of the state in the following language: ''Whereas the recent unprecedented drought in many sections of Montana, together with the nationwide economic depression, have brought about an acute employment situation with respect to the citizens of Montana, the alleviation of which requires the immediate inauguration and aggressive prosecution of an efficient and economical program of employment which will take advantage of all available federal, state and other funds promptly, to the end that employment of Montana citizens may be augmented to the greatest possible degree, that all federal funds may be used, and the citizens of this state may be relieved from public relief rolls and be given gainful employment;

''It is hereby declared to be a public policy that this state and all political subdivisions thereof, cooperate with any agency of the federal government in and for the construction, operation and maintenance of any plans or projects in aid of which such federal agency is about to or has expended funds furnished by the federal government, intended for a useful purpose, and calculated to furnish employment to the needy citizens of this state.''

On April 8, 1935, House Joint Resolution No. 117 was approved by the President of the United States (48 U. S. Stats. at L., p. 115.) This Act was known as the ''Emergency Relief Appropriation of 1935.'' As a part of the appropriation a sum of $900,000,000 was allocated for loans or grants for work projects of states, territories and possessions, including subdivisions and agencies thereof. The President by this Act was authorized to establish and prescribe the duties and functions of necessary agencies within the government; to carry its provisions into effect and to prescribe rules and regulations therefor. Subsequently the President, by executive order, created the Works Progress Administration as a governmental agency to prescribe rules and regulations to accomplish the purpose of

the Act. The Works Progress Administration was continued in operation by the Emergency Relief Appropriation Act of 1936 (49 Stat. 1608), and the Emergency Relief Appropriation Act of 1937 (50 Stat. 353), and the executive order made under the old Act was continued in operation by a new executive order.

Under the rules established by the Works Progress Administration the public works projects were sponsored by states and their political subdivisions. These bodies are required to cooperate in the enterprise of affording employment for the unemployed by providing materials, equipment and supplies, the Works Progress Administration furnishing the labor.

The Public Welfare Board is charged with "authority over and administration or supervision of all purposes and operations" as set forth in Chapter 82. Subdivision (a) of section VII of Part I of that Chapter, provides that it is the duty of the board to "administer or supervise all forms of public assistance including general relief." By subdivision (g) of the same section it is made the duty of the board to "assist and cooperate with other state and federal departments, bureaus, agencies and institutions, when so requested, by performing services in conformity with the purposes of this Act."

Section XIV of Part I of the Chapter provides: "The state board is empowered to enter into contracts and leases with the United States of America, its instrumentalities, or its agencies, or any thereof, to carry out any of the purposes set forth in this Act and may in such contracts or leases authorize the United States, its instrumentalities or agencies, or any thereof, to exercise such supervision over any property belonging to the state board, or any matter or thing the subject of said contract or lease, as it may be required by the United States, its instrumentalities, or its agencies, or any thereof, until such time as any money expended, advanced or loaned by the said United States, its instrumentalities or agencies, and agreed to be repaid thereto by the state board shall have been fully repaid. It is the purpose and intent of this Act that the state board shall be authorized and empowered to accept, cooperation from the United States of America, its instrumentalities and agencies in

all matters deemed necessary by the state board to carry out the purposes of this Act, and the state board shall have full power to do all things necessary in order to avail itself of such aid, assistance and cooperation under federal legislation heretofore or hereafter enacted by Congress or under any proclamation or order of the executive, or of any executive department or agency, of the United States, now or hereafter promulgated or made.''

The Public Welfare Board may under these statutes contract with a governmental agency, such as the Works Progress Administration, to furnish certain materials necessary to insure the institution and completion of projects reasonably designed to furnish relief to the unemployed in the form of work. This board is bound to supervise the expenditure of the funds appropriated by the state for its use. When the board delivers funds to the federal agency to be expended by it for materials to be thereafter purchased, and for use on projects to be thereafter selected, it is not administering or supervising the expenditure of these funds.

The affirmative answer of the board discloses that although on February 26, 1938, it directed the issuance and delivery of the check in question, it met with the Works Progress Administrator, the executive head of that governmental agency in this state at Butte on March 3, 4 and 5 ''for the purpose of allocating work projects throughout the several counties of the State of Montana to provide work relief for the needy and carry out the purposes for which the check'' was given. This allegation clearly demonstrates that at the time the check was authorized, there was no contract existing which imposed contractual obligations upon the board. The pleadings do not advise us as to what, if anything, was accomplished at the meeting in Butte. The most that could be said as to the status of the negotiations between the State Public Welfare Board and the Works Progress Administrator at the time of the passage of the resolution, was that there was an agreement between the board and the Works Progress Administration to enter into an agreement, the terms of which had not been agreed upon. In the case of *Esselstyn*

v. *Meyer & Chapman State Bank,* 63 Mont. 461, 208 Pac. 910, this court said: ''An agreement to be finally settled must comprise all the terms which the parties intend to introduce. An agreement to enter into an agreement upon terms to be afterward settled between the parties is a contradiction in terms.'' (See, also, *Kofoed* v. *Bray,* 69 Mont. 78, 220 Pac. 532.)

If the board in the exercise of its discretion desires to furnish materials for a project, it should furnish them and not merely turn over to some governmental agency or officer a sum of money to be expended by it or him when or where it or he pleases. Such an agency would in such event be exercising the functions which Chapter 82 contemplates should be performed by the board. The Public Welfare Board would under such an arrangement not be supervising and administering the funds appropriated but merely delivering the funds entrusted to it to be supervised and administered by an agency not answerable to the state of Montana.

Accordingly, we must hold that the respondent board, on the record before us, was without authority to authorize the delivery of the check. Let an injunction issue out of this court enjoining the respondent board from delivering the check for the sum of money, or any part thereof, in conformity with the resolution of February 26, 1938.

MR. CHIEF JUSTICE SANDS and MR. JUSTICE STEWART concur.

MR. JUSTICE ANGSTMAN, Dissenting:

In my opinion, under the broad powers given the Public Welfare Board by Chapter 82, Laws of 1937, to cooperate with federal agencies, it had the authority to take the action complained of here. Were I able to agree with what the majority hold on the other features of the case, I would not deem this point of much importance under the circumstances here. I think my associates are in error, however, in holding that Chapter 40, Laws of 1937, does not work an implied repeal of section 304, Revised Codes.

Section 304 expressly authorizes the use of any unexpended balance in any appropriation "for either of said years for which such appropriation has been made." The section thus treats the biennium as a unit. Chapter 40 of the later enactment by positive, unequivocal and definite language treats each year as a separate unit and prohibits the unexpended appropriation of one year being expended in the other. The title of Chapter 40 indicates the purpose of the Act to be as I have stated. Section 1 of the Act states that it shall be unlawful for any board to "expend, contract for the expenditure, or to incur or permit the incurring of any obligation whatsoever, in any one year, in excess of the income provided for such year." In order to make doubly sure that the unexpended balance of the first year's appropriation could not be expended during the second year, and in order to make sure that the purpose of the Act should not be thwarted by indirection, the legislature discouraged the buying of excessive supplies near the close of the first year. When such buying takes place, the legislature authorized the State Board of Examiners to reduce the second year's appropriation accordingly. This was done by section 3 of the Act, which provides:

"Prior to the beginning of each fiscal year the board of examiners must cause an inspection and inventory to be made of the stocks of supplies, materials, and articles on hand at or in or at the disposition of such institution, board, bureau, commission or department and said board must decrease the expenditures for the ensuing fiscal year by the amount or value of such supplies, materials, and articles so on hand or available, capable of utilization in such ensuing period and where further quantities thereof, or of substitutes therefor, will not be required, said decrease shall be effective upon the entry of order therefor on the minutes of the said board of examiners, and written notice thereof to the institution, department, bureau, board, commission, office, officer or employee affected by such order of said board; provided, that the aggregate inventoried value of such stocks of supplies, materials, and articles on hand at or in or at the disposition of any such institution, board, bureau, commission

or department as of June 30, 1936, as shown by the records of the state purchasing agent, shall not be deducted from appropriations available for such institutions.''

The obvious purpose of section 3 was to prohibit the expenditure of the one year's appropriation during that year but for the purpose of laying up supplies which cannot be used until the next year. If the unexpended balance of the first year's appropriation can be carried forward and expended in the second year of the biennium, then section 3 of Chapter 40 will serve no purpose. Conceding that the purpose of Chapter 40 was to prevent deficiency appropriations, as my associates hold, it is clear that the method by which the legislature sought to accomplish that result was by limiting expenditures each year to the appropriations made for each year.

The legislative purpose to prohibit the unexpended balance of one year's appropriation from being carried forward and expended in another year is made plain by Chapter 5 of the Laws of 1937. In section 1 of that chapter it is provided: ''And provided further that the total expenses of any such office, board, commission, bureau, department or authority of any kind shall not exceed in the aggregate during any fiscal year the amount appropriated by the legislature for such fiscal year for such office, board, commission, bureau, department, or authority of any kind.''

The conclusion which I have reached does not mean, however, that the appropriation for any year may not be exceeded by expenditures for that year. Section 2 of Chapter 40 authorizes the board of examiners in case of ''unforeseen and unanticipated emergency,'' rendering the appropriation insufficient for any year, to authorize expenditures in excess of the appropriation to the extent that the board of examiners may deem ''necessary and required.'' Hence, if the $2,001,000 for the year 1938 should be found insufficient and a sufficient emergency can be shown, the board of examiners has authority to authorize expenditures in excess of the appropriation, but in my opinion the unexpended balance of the appropriation for the year 1937

cannot be carried over and expended for the year 1938. The plain wording of the statute prohibits it.

MR. JUSTICE MORRIS:

I concur in the foregoing opinion by Mr. Justice Anderson directing that a writ of injunction issue restraining the Public Welfare Board from delivering the check involved in the controversy. The board is without power to disburse public funds in any such manner. I am not in accord with the other conclusions set forth in the opinion, and as to them I dissent.