No. 13179

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

THE MONTANA WILDERNESS ASSOCIATION, and
GALLATING SPORTMEN'S ASSOCIATION, INC.,

Plaintiffs and Respondents,

-vs-

THE BOARD OF HEALTH AND ENVIRONMENTAL SCIENCES
OF THE STATE OF MONTANA; THE DEPARTMENT OF HEALTH
AND ENVIRONMENTAL SCIENCES OF THE STATE OF MONTANA,

Defendants and Appellants,

and

BEAVER CREEK SOUTH, INC., a corporation,

Intervenor and Appellant.

---

Appeal from:   District Court of the First Judicial District,
               Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

For Appellants:

G. Steven Brown argued, Helena, Montana

For Intervenor:

Dzivi, Conklin, Johnson and Nybo, Great Falls,
Montana
William P. Conklin argued, Great Falls, Montana

For Respondents:

James Goetz argued, Bozeman, Montana

For Amicus Curiae:

Steven J. Perlmutter, Environmental Quality Council,
argued, Helena, Montana
Richard M. Weddle, Community Affairs, Helena, Montana
Donald R. Marble, Women Voters, Chester, Montana
Anderson, Symmes, Forbes, Peete & Brown, Home Builders,
Billings, Montana

---

Submitted:   December 6, 1976

Decided: DEC 30 1976

Filed: DEC 30 1976

Thomas J. Kearney
Clerk

Mr.Justice Wesley Castles delivered the Opinion of the Court.

This is an action by the Montana Wilderness Association and the Gallatin Sprttmen's Association, Inc., for declaratory and injunctive relief against a proposed subdivision development in Gallatin County known as Beaver Creek South. The district court of Lewis and Clark County entered summary judgment (1) that the environmental impact statement on the proposed subdivision was void, (2) ordering reinstatement of the prior sanitary restrictions on the proposed subdivision, and (3) enjoining further development of the proposed subdivision until the reimposed sanitary restrictions are legally removed. One of the defendants and intervenor, appeal.

The instant appeal is on rehearing and the opinion previously promulgated on July 22, 1976, is withdrawn.

Plaintiffs in the district court were the Montana Wilderness Association, a Montana nonprofit corporation dedicated to the promotion of wilderness areas and aiding environmental causes generally, and Gallatin Sportmen's Association, Inc., a Montana nonprofit corporation organized for charitable, educational and scientific purposes including the conservation of wildlife, wildlife habitat and other natural resources.

Defendants are (1) the Board of Health and Environmental Sciences and, (2) the Department of Health and Environmental Sciences of the State of Montana. Intervenor Beaver Creek South, Inc. is a Montana corporation and the developer of the proposed subdivision and has been made a party to the judgment. The Montana Environmental Quality Council, a statutory state agency, appeared in the district court as amicus curiae. The Montana Department of

Community Affairs appears as amicus curiae. Other amicus curiae appeared by brief.

Beaver Creek South owns a tract of approximately 160 acres adjacent to U.S. Highway 191 in the Gallatin Valley seven miles south of Big Sky of Montana. Early in 1973 Beaver Creek submitted to the Bozeman City-County Planning Board a subdivision plat for approval by that board and the Gallatin County Commissioners, contemplating development of 95 acres of that tract as a planned unit development in two phases. This submission and approval was required by sections 11-3859 through 11-3876, R.C.M. 1947, known as the Montana Subdivision and Platting Act. After publication of notice a public hearing was held on October 11, 1973 where the only public reaction was from the State Department of Fish and Game, expressing concern about possible infringement of wildlife habitat along the highway. Again, on January 10, 1974, a second public hearing was held after notice concerning a second phase of the development was given. At this second hearing, no public comments were received. Approval of the subdivision was recommended and carried out, subject to approval of water and sewer systems by the Montana Department of Health and Environmental Sciences as required by sections 69-4801 through 69-4827, R.C.M. 1947. The application for this approval had been made by the owner early in 1973 also. At the local level, neither plaintiff appeared at the public hearings.

After several months of conferences and tests the Department issued a draft environmental impact statement on April 8, 1974. The draft statement was issued purportedly because of the requirements of section 69-6504(b)(3), R.C.M. 1947, the Montana Environmental Policy Act (MEPA). A final impact statement was issued on June 26, 1974.

On July 26, 1974, the Department issued and delivered to Beaver Creek its certificate removing the sanitary restrictions on the plat.

On that same day, July 26, 1974, after the issuance of the certificate, the Department was served with an order to show cause and a temporary restraining order issued on the basis of this action filed by plaintiffs on July 25, 1974.

Even though it had already lifted the sanitary restrictions before service of the temporary restraining order, the Department chose on July 29, 1974 to rescind and invalidate its earlier certificate. Following this a series of procedural matters were had and the Department undertook to revise its Environmental Impact statement. At this point, the landowner, Beaver Creek, was not a party to the proceedings. It was allowed to intervene in September, 1974. The Gallatin County Board of County Commissioners was never a party to the action.

Motions to dismiss and briefs were filed, and on February 11, 1975, the district court ordered the temporary restraining order be dissolved, and the Associations be given an opportunity to file an amended complaint seeking a declaratory judgment on any impact statement other than the one filed in June 1974. In its memorandum and order, the district court found the Associations had standing to sue a state agency, but the Department must be given an opportunity to exercise its discretion and that an injunction would lie "only after the Department has acted unlawfully".

On February 14, 1975 the Department again conditionally removed the sanitary restrictions on Beaver Creek South.

On February 21, 1975, plaintiffs filed their second amended complaint seeking: (1) declaratory judgment that the Revised EIS

of the Department was inadequate in law; (2) a permanent injunction prohibiting Beaver Creek from selling any of the lots or further developing Beaver Creek South until compliance with the laws of Montana was effected; and (3) a mandatory injunction ordering the Department to reimpose sanitary restrictions on Beaver Creek South.

The focus of the second amended complaint is that the Revised EIS does not comply with legal requirements of MEPA in these particulars:

(1)  The Revised EIS does not disclose that the Department used to the fullest extent possible a systematic, interdisciplinary approach as required by section 69-6504(b)(1), R.C.M. 1947.

(2)  The Revised EIS does not include a detailed statement of alternatives to the proposed action nor were such alternatives studied, developed or described to the fullest extent possible as required by section 69-6504(b)(3)(iii) and 69-6504(b)(4), R.C.M. 1947.

(3)  The Revised EIS does not contain a detailed statement of the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity as required by section 69-6504(b)(3)(iv), R.C.M. 1947.

(4)  The Revised EIS does not include to the fullest extent possible a detailed statement of the environmental impact of the proposed subdivision as required by section 69-6504(b)(3)(i), R.C.M. 1947.

(5)  The Revised EIS contains no adequate consideration of the full range of the economic and environmental costs and benefits of the alternative actions available.

Defendants and intervenor filed motions to dismiss the second amended complaint. This complaint was further amended; the Environmental Quality Council was granted leave to file a brief as amicus curiae; briefs were filed by all parties; and the matter was submitted to the district court for decision.

The district court considered the motions to dismiss as motions for summary judgment under Rule 12(b)(6), M.R.Civ.P. and considered matters outside the pleadings, principally interrogatories and answers.

On August 29, 1975, the district court issued its opinion and declaratory judgment. In substance the district court held the plaintiffs have standing to prosecute this action, that the Revised EIS does not meet statutory requirements in various particulars, and plaintiffs are entitled to injunctive relief. Judgment was entered accordingly.

Defendant Department of Health and Environmental Sciences and intervenor Beaver Creek South, Inc. appeal from the judgment.

The single determinative issue here is the function of the Department in land use decisions such as is involved in this case; that is, a simple subdivision plat. Other ancillary issues as to "standing" of the plaintiff associations to sue and the right to injunctive relief have been briefed and argued but need not be determined here because of our view of the law of Montana. It is seen that the district court findings and judgment are premised on the MEPA being the ruling statute; and that the Department of Health is required to file an impact statement; and, further, that the Department has the final land use decision over and above the water supply, sewage and solid waste disposal issues. Although the district court did not specifically discuss this problem, it can be the only basis for its decision.

In analyzing the law of Montana, three acts of the Montana legislature are involved. The three acts which must be looked to and harmonized are:

(1)  The 1967 <u>Subdivision Sanitation Act</u>, sections 69-5001 through 5009, R.C.M. 1947.

This Act prohibits the recording of any subdivision plat until the Department issues its certificate removing sanitary restrictions from the plat.  It is primarily a public health measure and is designed to protect the quality and potability of public water supplies.

(2)  The 1971 <u>Montana  Environmental Policy Act</u>, sections 69-6501 through 6518, R.C.M. 1947.  This Act declares as its purpose in section 69-6502:

> "The purpose of this act is to declare a state policy
> which will encourage productive and enjoyable harmony
> between man and his environment; to promote efforts
> which will prevent or eliminate damage to the environ-
> ment and biosphere and stimulate the health and welfare
> of man; to enrich the understanding of the ecological
> systems and natural resources important to the state; and
> to establish an environmental quality council."

The MEPA then goes on to describe in general terms the environmental impacts that must be assessed when agencies of the state make major decisions having a significant impact on the human environment.  Section 69-6504 requires state agencies to prepare detailed statements analyzing the impacts of <u>major actions of state government</u> in several categories.  In that same section the "responsible state official" shall consult with other state agencies, and, in subdivision (6) provides that state agencies shall:

> "make available to counties, municipalities,
> institutions, and individuals, advice and information
> useful in restoring, maintaining, and enhancing the
> quality of the environment".

The MEPA also created a legislative branch entity known as the Environmental Quality Council. This group has been vested with legislative watchdog authority as a sort of legislative auditor within the legislative branch of government. This Act was amended in 1975 to that all voting members of the council are legislative members. The original Act was passed prior to the effective date of the 1972 Montana Constitution.

(3) The 1973 <u>Subdivision and Platting Act</u>, sections 11-3859 through 11-3876, R.C.M. 1947. This Act confers upon local governing bodies the authority to approve or disapprove a subdivision based on a variety of environmental, economic and social factors (section 11-3863). That section, 11-3863, describes the content of the regulations that must be adopted by every local governing body to insure the "* * * orderly development of their jurisdictional areas * * *." The factors that must be considered include the impact on roads, the need for additional roadways and utility easements, adequate open spaces, water, drainage, sanitation facilities and others, including environmental factors. Also in that section it is provided that the state department of intergovernmental relations shall prescribe reasonable minimum requirements for the local governmental units' regulations which shall include "detailed criteria for the content of the environmental assessment required by the act." Public hearings are required and the local governing body "shall consider all relevant evidence relating to the public health, safety and welfare, including the environmental assessment * * *."

It is also noted that section 69-5001 of the 1967 Subdivision Sanitation Act (also amended in 1973) limited expressly the involvement of the Department to "water supply, sewage disposal, and solid waste disposal".

Further analysis of the 1973 Subdivision and Platting Act will demonstrate unequivocally a legislative intent to place control of subdivision development in local governmental units in accordance with a comprehensive set of social, economic, and environmental criteria and in compliance with detailed procedural requirements.

Significantly, no similar mandate is given in the 1971 MEPA. Thus we conclude that the district court's reasoning, necessarily implied from its holding, that MEPA extends the Department's control over subdivisions beyond matters of water supply, sewage and solid waste disposal is in error as it is in direct conflict with the legislature's undeniable policy of local control as expressed in the Subdivision and Platting Act.

A further comparison of the local control versus State control over subdivisions is this---the 1973 legislature charged local governing bodies with comprehensive control over subdivision development, and amended that law in 1974 and 1975. If the 1971 MEPA already lodged this control in the state Department, such legislation was superfluous. Also, the express purpose of MEPA set out previously herein states to "encourage", "promote" and "enrich" [understanding]. Nowhere in the MEPA is found any regulatory language.

We refer back to the procedures here. The local governing unit, the Gallatin County Commission, had already complied with the laws. It was not made a party to this action. It had a statutory duty and right to act. The MEPA does not change the law with regard to that. Accordingly the judgment directed to the Department's failure to adequately write an environmental impact statement has nothing to do with the authority of the county commission to act. As to the Department, it of course, can

- 9 -

supplement information available to local governing bodies, but its only regulatory function is in the statutorily prescribed areas of water supply, sewage and solid waste disposal.

We have not herein set out the function of the Montana Department of Community Affairs which has submitted a brief amicus curiae. But we do observe that detailed procedures for intergovernmental functions are set out by statutes, regulations, and procedures for protection of the environment.

Finding, as we have, that the regulatory function of subdivisions is local, the judgment and injunctive order of the district court is reversed and the complaint ordered dismissed.

_____
Justice.

We concur.

_____
Honorable A. B. MARTIN
Sitting for Honorable JAMES T.
HARRISON

_____
Justice.

- 10 -

Mr. Justice Frank I. Haswell dissenting:

The decision of the Court today deals a mortal blow to environmental protection in Montana. With one broad sweep of the pen, the majority has reduced constitutional and statutory protections to a heap of rubble, ignited by the false issue of local control.

This case does not concern local approval of subdivision plats by county commissioners under the Subdivision & Platting Act. Neither the county commissioners nor the city-county planning board is a party to this litigation. Nobody claims that the county commissioners do not have the power of approval of subdivision plats in conformity with the Subdivision & Platting Act. State v. local control is simply a "red herring" in this case.

The real issues in this case concern the right of two essentially local environmental organizations whose members make substantial use of nearby public lands for recreational purposes to compel a state agency to conform to the requirements of the Montana Environmental Policy Act regarding an Environmental Impact Statement to the end that an adequate environmental assessment will be made and considered by the decision makers, be they local or state or whoever they may be. If they cannot, the inalienable right of all persons to a clean and healthful environment guaranteed by Montana's Constitution confers a right without a remedy; the requirements of Montana's Environmental Policy Act and related environmental legislation become meaningless and illusory; and the mandatory Environmental Impact Statement deteriorates into a meaningless gibberish, providing protection to no one. These issues

- 11 -

are embodied in the three principal issues raised by the parties, viz. standing, the validity of the Environmental Impact Statement, and injunctive relief.

In my view, the majority neatly sidesteps these real issues in this case. Instead, the majority decision effectively nullifies express state policy/environmental matters contained
on
in the Montana Environmental Policy Act, House Joint Resolution 73 approved March 16, 1974, and substantially interferes with and limits the effective operation of the legislature's Environmental Quality Council.

Because this Court has made a 180° turn from its original position, I set out the original decision of this Court for comparison. I believe the original decision is correct, legally sound, and effectuates the purposes and objective of Montana's Constitution and its statutes relating to the environment.

This is an action by the Montana Wilderness Association and the Gallatin Sportsmen's Association, Inc., for declaratory and injunctive relief against a proposed subdivision development in Gallatin County known as Beaver Creek South. The district court of Lewis and Clark County entered summary judgment (1) that the environmental impact statement on the proposed subdivision was void, (2) ordering reinstatement of the prior sanitary restrictions on the proposed subdivision, and (3) enjoining further development of the proposed subdivision until the reimposed sanitary restrictions are legally removed. One of the defendants and intervenor appeal.

Plaintiffs in the district court were the Montana Wilderness Association, a Montana nonprofit corporation dedicated to the promotion of wilderness areas and aiding environmental causes generally, and Gallatin Sportsmen's Association, Inc., a Montana nonprofit corporation organized for charitable, educational and scientific purposes including the conservation of wildlife, wildlife habitat and other natural resources.

Defendants are (1) the Board of Health and Environmental Sciences and, (2) the Department of Health and Environmental Sciences of the State of Montana. Intervenor Beaver Creek South, Inc. is a Montana corporation and the developer of the proposed subdivision. The Montana Environmental Quality Council, a statutory state agency, appeared in the district court as amicus curiae.

Beaver Creek South is located in the canyon of the West Gallatin River adjacent to U.S. Highway 191 about seven miles south of Meadow Village of Big Sky of Montana. Beaver Creek crosses a portion of the property for about one-quarter mile along the north

side.  The general area where the proposed subdivision is located
is a scenic mountain canyon area presently utilized as a wildlife
habitat and a grazing area for livestock.  Beaver Creek supports a
salmonoid fishery.  A two lane public highway, U.S. 191, runs
through the canyon.

The developer Beaver Creek South, Inc., hereinafter called
Beaver Creek, intends to subdivide approximately 95 acres into
75 lots for single-family and multi-family residences and a maxi-
mum of seven and one-half acres abutting U.S. Highway 191, for a
neighborhood commercial area.  The development of the subdivision
is to be accomplished in two phases.

In 1973 Beaver Creek submitted to the Bozeman City-County
Planning Board its subdivision plat contemplating Beaver Creek South
for approval by the board and the county commissioners as required
by sections 11-3859 through 11-3876, R.C.M. 1947, the Montana Sub-
division and Platting Act.  In the spring of 1974 Beaver Creek filed
the subdivision plat and plans and specifications for a water supply
and sewer system with the Montana Department of Health and Environ-
mental Sciences (hereinafter called the Department) for review and
approval as required by sections 69-5001 through 69-5009, R.C.M.
1947, the Sanitation in Subdivisions Act.  Section 69-5003 (2)(b)
provides that a subdivision plat may not be filed with the county
clerk and recorder until the Department has certified "that it has
approved the plat and plans and specifications and the subdivision
is subject to no sanitary restriction".

In April 1974 the Department circulated a "draft" environ-
mental impact statement on the proposed subdivision in order to
obtain comments on the proposal pursuant to section 69-6504(b)(3),

- 3 -

R.C.M. 1947, of the Montana Environmental Policy Act (MEPA). Written comments were received and the Department issued its "final" environmental impact statement in June 1974. The following month plaintiff Associations commenced this action seeking a permanent injunction against the Department's removal of sanitary restrictions on the proposed Beaver Creek South. The Associations alleged failure of compliance with subdivision laws, administrative rules, Environmental Quality Council guidelines, and MEPA. The district court issued a temporary restraining order and an order to show cause. The Department and the Associations entered into a stipulation vacating the show cause hearing and the Department revised its final environmental impact statement, submitting a copy to the district court in October 1974. This revised final environmental impact statement is hereinafter called the Revised EIS.

Meanwhile, in September 1974, Beaver Creek was granted leave to intervene. Motions to dismiss and briefs were filed, and on February 11, 1975, the district court ordered the temporary restraining order be dissolved, and the Associations be given an opportunity to file an amended complaint seeking a declaratory judgment on any impact statement other than the one filed in June 1974. In its memorandum and order, the district court found the Associations had standing to sue a state agency, but the Department must be given an opportunity to exercise its discretion and that an injunction would lie "only after the Department has acted unlawfully".

On February 14, 1975 the Department conditionally removed the sanitary restrictions on Beaver Creek South.

On February 21, 1975, plaintiffs filed their second amended complaint seeking: (1) declaratory judgment that the Revised EIS of the Department was inadequate in law; (2) a permanent injunction

- 4 -

prohibiting Beaver Creek from selling any of the lots or further developing Beaver Creek South until compliance with the laws of Montana was effected; and (3) a mandatory injunction ordering the Department to reimpose sanitary restrictions on Beaver Creek South.

The focus of the second amended complaint is that the Revised EIS does not comply with legal requirements of MEPA in these particulars:

(1) The Revised EIS does not disclose that the Department used to the fullest extent possible a systematic, interdisciplinary approach as required by section 69-6504(b)(1), R.C.M. 1947.

(2) The Revised EIS does not include a detailed statement of alternatives to the proposed action nor were such alternatives studied, developed or described to the fullest extent possible as required by section 69-6504(b)(3)(iii) and 69-6504(b)(4), R.C.M. 1947.

(3) The Revised EIS does not contain a detailed statement of the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity as required by section 69-6504(b)(3)(iv), R.C.M. 1947.

(4) The Revised EIS does not include to the fullest extent possible a detailed statement of the environmental impact of the proposed subdivision as required by section 69-6504(b)(3)(i), R.C.M. 1947.

(5) The Revised EIS contains no adequate consideration of the full range of the economic and environmental costs and benefits of the alternative actions available.

Defendants and intervenor filed motions to dismiss the second amended complaint. This complaint was further amended; the Environmental Quality Council was granted leave to file a brief as amicus

- 5 -

curiae; **briefs** were filed by all parties; and the matter was submitted to the district court for decision.

The district court considered the motions to dismiss as motions for summary judgment under Rule 12(b)(6), M.R.Civ.P. and considered matters outside the pleadings, principally interrogatories and answers.

On August 29, 1975 the district court issued its opinion and declaratory judgment. In substance the district court held the plaintiffs have standing to prosecute this action, that the Revised EIS does not meet statutory requirements in various particulars, and plaintiffs are entitled to injunctive relief. Judgment was entered accordingly.

Defendant Department of Health and Environmental Sciences and intervenor Beaver Creek South, Inc. appeal from the judgment.

The issues can be summarized in this fashion:

1) Do plaintiff Associations have standing to maintain this action?

2) Does the Revised EIS satisfy the procedural requirements of the Montana Environmental Policy Act (MEPA)?

3) Are plaintiff Associations entitled to injunctive relief?

Appellants challenge the standing of the Associations to bring this suit. Appellants' arguments fall into three main categories: a) that the Associations have suffered no cognizable injury; b) that any injury suffered or threatened is indistinguishable from the injury to the public generally; and c) that neither MEPA, the Montana Administrative Procedure Act, nor any other statute grants standing to these Associations to sue agencies of the state.

Initially, the question of environmental standing under MEPA is one of first impression in Montana. Therefore, the Associations

and amicus curiae have presented this Court with numerous authorities from other jurisdictions on the issue of environmental standing. We have reviewed these authorities in detail. We find none are controlling as to the question before us, but a brief review of such authorities aids in the illumination of the determinative factors regarding this issue.

The Associations urge this Court to adopt the rationale of the federal courts in finding environmental standing because the relevant portions of MEPA in issue here are patterned virtually verbatim after corresponding portions of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 through 4347, (NEPA).

In the federal courts, citizen challenges to alleged illegal agency action are often brought pursuant to the federal Administrative Procedure Act, 5 U.S.C. §§ 701 through 706. The companion cases of Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L ed 2d 184,188; and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L ed 2d 192 (1970), established the federal two-pronged test for standing to sue administrative agencies. The United States Supreme Court held that persons have standing to obtain judicial review of federal agency action under the federal Administrative Procedure Act where they allege that the challenged action causes them injury in fact and where the alleged injury is to an interest "arguably within the zone of interests to be protected or regulated" by the statutes that the agencies are claimed to have violated.

Data Processing and Barlow did not concern environmental matters, but such a case was presented in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L ed 2d 636, 641, (1972). In Sierra Club,

a conservation organization alleged its "special interest" in conservation and sound management of public lands, and sued the Secretary of the Interior for declaratory and injunctive relief against the granting of approval or issuance of permits for commercial exploitation of a national game refuge area in California. Petitioner invoked the judicial review provisions of the federal Administrative Procedure Act. The Supreme Court commenced its discussion of standing with this statement:

> "* * * Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy,' Baker v. Carr, 369 U.S. 186, 204, 7 L ed 2d 663, 678, 82 S.Ct. 691, as to ensure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' Flast v. Cohen, 392 U.S. 83, 101, 20 L ed 2d 947, 962, 88 S.Ct. 1942. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff."

The Supreme Court held that petitioner lacked standing solely because it did not sufficiently allege "injury in fact" to its "individualized interests", that is, its individual members. Thus the Court did not reach the question of whether petitioner satisfied the "zone of interest" test.

In United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L ed 2d 254, 269, (1973), proceedings were brought against the Interstate Commerce Commission (ICC) to enjoin the enforcement of certain administrative orders. Plaintiff organization alleged injury in that each of its members used the natural resources in the area of their legal residences for camping, hiking, fishing, sightseeing, and other

recreational and aesthetic purposes. The alleged illegal activity was that the ICC failed to include with its orders a detailed environmental impact statement as required by NEPA. The Court found the allegations of the complaint with respect to standing were sufficient to withstand a motion to dismiss in the district court. The Court also reiterated from Sierra Club that "injury in fact" is not confined to economic harm:

> "* * * Rather, we explained [in Sierra Club] : 'Aesthetic and environmental well-being, like economic well-being, are important ingredients in the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process.' * * * Consequently, neither the fact that the appellees here claimed only a harm to their use and enjoyment of the natural resources of the Washington area, nor the fact that all those who use those resources suffered the same harm, deprives them of standing."

It was undisputed that the "environmental interests" asserted by plaintiff were within the "zone of interests" to be protected or regulated by NEPA, the statute claimed to have been violated.

Sierra Club and SCRAP underscore the fact that in the federal courts environmental standing has developed in the statutory context of the federal Administrative Procedure Act.

The lower federal courts have, of course, followed the "injury in fact" and "zone of interest" test. For example, in the Ninth Circuit Court: National Forest Preservation Group v. Butz, 485 F.2d 408 (1973); Cady v. Morton, 8 ERC 1097, 527 F.2d 786 (1975); City of Davis v. Coleman, 521 F.2d 661 (1975).

Here, the Associations also cite several cases from California and Washington in support of their standing argument. The experience in the state of Washington has some pertinence to our inquiry. Washington's State Environmental Policy Act, Washington Revised Code,

- 9 -

Ch. 43.21C (1974) (SEPA), is also modeled after NEPA and has been interpreted by the Washington courts in several cases. The leading case as to standing is Leschi Improvement Council v. Washington State Highway Commission, 84 Wash.2d 271, 525 P.2d 774, 786, (1974). Washington's SEPA, like MEPA, contains no express provision for judicial review at the behest of private parties. In Leschi petitioners obtained review of a state highway commission's limited access and design hearings and of the commission's environmental impact statement, not pursuant to any statutory grant of standing, but by way of certiorari in the state's lower court. Petitioners also sought an injunction. The Washington Supreme Court held the petitioners had standing because they raised the question of whether a nonjudicial administrative agency committed an illegal act violative of fundamental rights. An illegal act was said to be one which is contrary to statutory authority. More important, the court held that petitioners sufficiently alleged violation of a fundamental right because of the language in SEPA that each person has a "fundamental and inalienable right to a healthful environment." Washington Revised Code §43.21C.020(3). This section schematically corresponds to MEPA section 69-6503(b), which recognizes that "each person shall be entitled to a healthful environment * * *."

In Leschi four justices dissented. They objected to the standing of petitioners because:

> "* * * Judicial review of the administrative proceeding involved, at the instance of persons standing in the position of the appellants, is not authorized by any statute or any doctrine of the common law, and there is no suggestion that it is mandated by any provision of the state or federal constitutions." (Emphasis supplied.)

Here, appellants suggest this Court follow certain Montana cases in denying standing on the ground that the Associations lack standing to enjoin public officers from acting. This argument fails

to distinguish between the separate questions of standing and of injunctive relief. The particular issue of injunctions will be treated separately hereinafter.

In Montana, the question of standing to sue government agencies has arisen in the context of taxpayer and elector suits. State ex rel. Mitchell v. District Court, 128 Mont. 325, 339, 275 P.2d 642, involved a complaint seeking to enjoin the secretary of state from certifying nominees for election to a certain office. This Court said:

> "The complaint which the plaintiff * * * filed in the district court shows that his only interest is as a taxpaying, private citizen and prospective absentee voter. It wholly fails to show that he will be injured in any property or civil right. Thus does [his] own pleading show him to be without standing or capacity to invoke equitable cognizance of a purely political question * * *." (Emphasis supplied.)

Holtz v. Babcock, 143 Mont. 341, 380, 390 P.2d 801, was an action to enjoin the governor and other state officers from performing an agreement regarding an airplane lease. It was held that plaintiff lacked standing to sue as a citizen, resident, taxpayer and airplane owner. On petition for rehearing the Court stated:

> "* * * The only complaint a taxpayer can have is when [the alleged state action] affects his pocketbook by unlawfully increasing his taxes. Appellant here does not allege any particular injury which he personally would suffer." (Emphasis supplied.)

In State ex rel. Conrad v. Managhan, 157 Mont. 335, 338, 485 P.2d 948, the Court summarily stated:

> "* * * We hold that relators as affected taxpayers, have standing to bring a declaratory judgment action [against county assessors and the state board of equalization] concerning a tax controversy * * *." (Emphasis supplied.)

Chovanak v. Matthews, 120 Mont. 520, 525-527, 188 P.2d 582, concerns an attack against the constitutionality of a statute rather than a challenge to particular agency action. However, we look to _Chovanak_ for its general discussion of the principles of standing. There the plaintiff sued the state board of equalization for a declaratory judgment that a slot machine licensing act was constitutionally void. Plaintiff alleged he was a resident, citizen, taxpayer and elector of the county where the action was commenced. We quote _Chovanak_ for the sound rules of jurisprudence enunciated:

> "It is by reason of the fact that it is only judicial power that the courts possess, that they are not permitted to decide mere differences of opinion between citizens, or between citizens and the state, or the administrative officials of the state, as to the validity of statutes. * * *

> "* * * The judicial power vested in the district courts and the Supreme Court of Montana, by the provisions of the Montana Constitution extend to such 'cases at law and in equity' as are within the judicial cognizance of the state sovereignity. Article 8, secs. 3, 11. By 'cases' and 'controversies' within the judicial power to determine, is meant real controversies and not abstract differences of opinion or moot questions. Neither federal nor state Constitution has granted such power.

> "* * *

> "The only interest of the appellant in the premises appears to be that he is a resident, citizen, taxpayer and elector of the county * * *. He asserts no legal right of his that the said board has denied him, and sets forth no wrong which they have done to him, or threatened to inflict upon him.

> "Appellant's complaint is in truth against the law, not against the board of equalization. He represents no organization that has been denied a slot machine license. He seeks no license for himself. In fact it appears from his complaint that slot machines, licensed or unlicensed, are utterly anathema to him. There is no controversy between him and the board of equalization.

> "* * *

- 12 -

"It is held in Montana, as it is held in the United States Supreme Court, and by courts throughout the nation, that a showing only of such interest in the subject of the suit as the public generally has is not sufficient to warrant the exercise of judicial power. * * *"

It is clear from these Montana cases that the following factors constitute sufficient minimum criteria, as set forth in a complaint, to establish standing to sue the state:

1) The complaining party must clearly allege past, present or threatened injury to a property or civil right.

2) The alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party.

3) The issue must represent a "case" or "controversy" as is within the judicial cognizance of the state sovereignty.

With the foregoing criteria in mind, we hold plaintiff Associations have standing to seek judicial review of the Department's actions under MEPA.

First, the complaint alleges a threatened injury to a civil right of the Associations' members, that is, the "inalienable * * * right to a clean and healthful environment", Article II, Section 3, 1972 Montana Constitution. This constitutional provision, enacted in recognition of the fact that Montana citizens' right to a clean and healthful environment is on a parity with more traditional inalienable rights, certainly places the issue of unlawful environmental degradation within the judicial cognizance.

We have studied appellants' arguments that Article IX, Section 1, 1972 Montana Constitution, states that the legislature shall provide for the enforcement of the state's duty to "maintain and improve a clean and healthful environment in Montana", and the

- 13 -

legislature shall provide for "adequate remedies" to protect it. We have studied the Constitutional Convention minutes surrounding Article IX and are aware the intent of the delegation was for the legislature to act pursuant to Article IX. But, we cannot ignore the bare fact that the legislature has not given effect to the Article IX, Section 1 mandate over a period of years. Moreover, the declaration of rights in Article II, the Article dealing with citizens' fundamental rights, gives "All persons" in Montana a sufficient interest in the Montana environment to enable them to bring an action based on those rights, provided they satisfy the other criteria set forth.

Intervenors urge this Court to consider the lengthy dissent in the Washington Leschi case as persuasive authority that the plaintiff Associations lack standing. The portion of that dissent relied upon, deals with the proposition the petitioners there came under no statutory grant of standing and were therefore excluded from the courts in a SEPA case. However, that dissent actually supports our holding here. The dissent assails the purported statutory creation of a "fundamental right" in SEPA upon which standing may be founded, and argues that a fundamental right can only be derived from the fundamental law. We concur and find an inalienable, or fundamental, right was created in our fundamental law, Article II, Section 3, 1972 Montana Constitution.

Second, the complaint alleges on its face an injury to the Associations which is distinguishable from the injury to the general public. When the plaintiffs do not rely on any statutory grant of standing, as here, courts must look to the nature of the interests of plaintiffs to determine/plaintiffs are in a position whether to represent a "personal stake in the outcome of the controversy"

- 14 -

ensuring an "adversary context" for judicial review. Sierra Club v. Morton, supra; Chovanak v. Matthews, supra. Both Associations allege, in effect, that they are relatively large, permanent, nonprofit corporations dedicated to the preservation and enhancement of wilderness, natural resources, wildlife and associated concerns. Both Associations allege substantial use of the public lands adjacent to Beaver Creek South by their members for various recreational purposes. The Gallatin Sportsmen's Association contributed to the Department's Revised EIS by way of written comments to the draft environmental impact statement. These facts are sufficient to permit the Associations to complain of alleged illegal state action resulting in damage to the environment.

Third, there can be no doubt that unlawful environmental degradation is within the judicial cognizance of the state sovereignty. The constitutional provisions heretofore discussed and MEPA itself unequivocally demonstrate the state's recognition of environmental rights and duties in Montana. The courts of the state are open to every person for the remedy of lawfully cognizable injuries. Article II, Section 16, 1972 Montana Constitution; Section 93-2203, R.C.M. 1947.

Finally, we reiterate these Associations are citizen groups seeking to compel a state agency to perform its duties according to law. This concept is novel in Montana only insofar as it is raised here in the context of the state's explicit environmental policy. Were the Associations denied access to the courts for the purpose of raising the issue of illegal state action under MEPA, the foregoing constitutional provisions and MEPA would be rendered useless verbiage, stating rights without remedies, and leaving the

state with no checks on its powers and duties under that act.
The statutory functions of state agencies under MEPA cannot be left
unchecked simply because the potential mischief of agency default
in its duties may affect the interests of citizens without the
Associations' membership.  United States v. SCRAP, supra.

The second major issue concerns the adequacy of the
Revised EIS filed by the Department on the Beaver Creek South
subdivision.

Throughout the argument Beaver Creek/maintained that MEPA
has no bearing upon the Department's review of the proposed sub-
division plat and an environmental impact statement is not required.
If such statement is required, then Beaver Creek allies itself with
the Department's position.  The Department concedes that an
environmental impact statement is required, but contends its
responsibilities under MEPA are circumscribed by other statutory
authority.  In both Beaver Creek's and the Department's arguments,
the thrust is that subdivision review has been comprehensively
provided for in two acts hereinbefore cited: the Subdivision and
Platting Act and the Sanitation in Subdivisions Act.  They allege
the clear legislative intent of the Subdivision and Platting Act
is to place final subdivision approval authority in the hands of
local government (e.g., section 11-3866, R.C.M. 1947), and the
Department can interfere with town, city, or county subdivision
approval only to the extent of its particular expertise and authority
under the Sanitation In Subdivisions Act. Thus, they allege, if a
Department environmental impact statement is required, it need deal
in detail only with the environmental effects related to water
supply, sewage disposal, and solid waste disposal.

- 16 -

Montana's Environmental Policy Act was enacted in 1971 and is patterned after the National Environmental Policy Act. It is a broadly worded policy enactment in response to growing public concern over the innumerable forms of environmental degradation occurring in modern society. The first two sections of MEPA state:

"69-6502. Purpose of act. The purpose of this act is to declare a state policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the state; and to establish an environmental quality council."

"69-6503. Declaration of state policy for the environment. The legislative assembly, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the state of Montana, in co-operation with the federal government and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can coexist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Montanans.

"(a) In order to carry out the policy set forth in this act, it is the continuing responsibility of the state of Montana to use all practicable means, consistent with other essential considerations of state policy, to improve and co-ordinate state plans, functions, programs, and resources to the end that the state may ---

"(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

"(2) assure for all Montanans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

"(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable or unintended consequences;

"(4) preserve important historic, cultural, and natural aspects of our unique heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

"(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

"(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

"(b) The legislative assembly recognizes that each person shall be entitled to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment."

These sections unequivocably express the intent of the Montana

legislature regarding environmental policy.

But MEPA does more than express lofty policies which want

for any means of legislative or agency implementation. Section 69-

6504, R.C.M. 1947, contains "General directions to state agencies"

and provides:

"The legislative assembly authorizes and directs that to the fullest extent possible.

"(a) The policies, regulations, and laws of the state shall be interpreted and administered in accordance with the policies set forth in this act, and

"(b) all agencies of the state shall

"(1) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment;

"(2) identify and develop methods and procedures, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations;

- 18 -

"(3)   include in every recommendation or report
on proposals for projects, programs, legislation and
other major actions of state government significantly
affecting the quality of the human environment, a detailed
statement on ---

        "(i)   the environmental impact of the pro-
posed action,

        "(ii)   any adverse environmental effects which
cannot be avoided should the proposal be implemented,

        "(iii)   alternatives to the proposed action,

        "(iv)   the relationship between local short-
term uses of man's environment and the maintenance and
enhancement of long-term productivity, and

        "(v)   any irreversible and irretrievable
commitments of resources which would be involved in the
proposed action should it be implemented.

"Prior to making any detailed statement, the responsible
state official shall consult with and obtain the comments
of any state agency which has jurisdiction by law or special
expertise with respect to any environmental impact in-
volved.   Copies of such statement and the comments and views
of the appropriate state, federal, and local agencies,
which are authorized to develop and enforce environmental
standards, shall be made available to the governor, the
environmental quality council and to the public, and shall
accompany the proposal through the existing agency review
processes. * * *"

The "detailed statement" described by subsection (b)(3) is

referred to as the environmental impact statement, or EIS.

Appellants emphasize that the Subdivision and Platting Act

was passed two years after MEPA, and this circumstance expresses a

legislative intent that local review of environmental factors,

particularly under sections 11-3863 and 11-3866, R.C.M. 1947, ob-

viates the necessity for Departmental review.   Such an interpreta-

tion, however, conflicts with the terms of MEPA, in section 69-6507,

R.C.M. 1947:

        "The policies and goals set forth in this act are
supplementary to those set forth in existing authoriza-
tions of all boards, commissions, and agencies of the
state."

Had the legislature intended local review to replace the rigorous review required by responsible state agencies, it could easily have so stated. The existing statutes evince a legislative intent that subdivision decisions be made at the local planning level based upon factors with an essentially local impact, and that state involvement triggers a comprehensive review of the environmental consequences of such decisions which may be of regional or state-wide importance.

An illustration of this interpretation is provided by a comparison of the provisions of MEPA, hereinbefore set forth, with certain provisions of the Subdivision and Platting Act. The statement of policy in the Subdivision and Platting Act contains a mandate to "require development in harmony with the natural environment", section 11-3860, R.C.M. 1947. Section 11-3863(1), R.C.M. 1947, requires local governing bodies to adopt regulations and enforcement measures for, inter alia, "the avoidance of subdivision which would involve unnecessary environmental degradation * * *." Subsection (2) requires the department of community affairs to prescribe minimum requirements for local government subdivision regulations, including "criteria for the content of the environmental assessment required by this act." Subsection (3) provides that this "environmental assessment" must be submitted to the governing body by the subdivider. Subsection (4) describes the environmental assessment which emphasizes research as to water, sewage, soil and local services. While these factors may be among the more significant immediate environmental problems created by a subdivision, an assessment of them does not approach the scope of the inquiry required by MEPA section 69-6504, R.C.M. 1947.

Furthermore, there is no irreconcilable repugnancy between these acts which would render either the Subdivision and Platting Act or MEPA a nullity. It is suggested the district court's judgment leads to the proposition that the Department could "veto" a local subdivision approval solely on the basis of its EIS --- in direct contravention of the intent of the Subdivision and Platting Act. While this "veto" prospect is feasible, two points are disregarded by the argument. First, MEPA was enacted to mitigate environmental degradation "to the fullest extent possible". Second, MEPA does not call for a halt to all further development; its express direction to agencies is to "utilize a systematic, interdisciplinary approach" to foster sound environmental planning and decision making. A state agency acting pursuant to this directive does not invoke the specter of state government vetoing viable local decisions. The concurrent functions of local and state governments with respect to environmental decisions serve to enhance the environmental policy expressed in all of the statutes here considered, that action be taken only upon the basis of well-informed decisions.

Thus, the statutes must be read together as creating a complementary scheme of environmental protection. As stated in Fletcher v. Paige, 124 Mont. 114, 119, 220 P.2d 484:

> "The general rule is that for a subsequent statute to repeal a former statute by implication, the previous statute must be wholly inconsistent and incompatible with it. United States v. 196 Buffalo Robes, 1 Mont. 489, approved in London Guaranty & Accident Co. v. Industrial Accident Board, 82 Mont. 304, 309, 266 Pac. 1103, 1105. The court in the latter case continued: 'The presumption is that the Legislature passes a law with deliberation and with a full knowledge of all existing ones on the same subject, and does not intend to interfere with or abrogate a former law relating to the same matter unless the repugnancy between the two is irreconcilable.'"

See: City of Billings v. Smith, 158 Mont. 197, 490 P.2d 221; State ex rel. Esgar v. District Court, 56 Mont. 464, 185 P. 157.

Support for our interpretation of the scope of MEPA is found in a leading federal case interpreting the NEPA. In Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1112, 17 ALR Fed 1 (D.C.Cir. 1971), regulations proposed by the Atomic Energy Commission (AEC) were challenged on the basis that the proposed regulations did not adequately provide for consideration of all environmental factors as mandated by NEPA. The AEC argued that its authority extended only to nuclear related matters and that it was prohibited from independently evaluating and balancing environmental factors which were considered and certified by other federal agencies. The Calvert Cliffs' court found the AEC's interpretation of NEPA unduly restricted, stating:

"NEPA * * * makes environmental protection a part of the mandate of every federal agency and department. The Atomic Energy Commission, for example, had continually asserted prior to NEPA, that it had no statutory authority to concern itself with the adverse environmental effects of its actions. Now however, its hands are no longer tied. It is not only permitted, but compelled, to take environmental values into account."

The district court was correct in treating MEPA as the controlling statute in this case.

The district court held the Revised EIS does not comply procedurally with MEPA on eight separate grounds. The court expressly declined to venture into a review of the substantive merits of the Department's reasoning and conclusions.

A preliminary question is the inquiry into the proper scope of review of the Revised EIS by the courts. Because MEPA is modeled after NEPA, it is appropriate to look to the federal interpretation of NEPA. This Court follows the rule found in Ancient Order of Hiberians v. Sparrow, 29 Mont. 132, 135, 74 P. 197:

"'* * * that the construction put upon statutes by the courts of the state from which they are borrowed is

- 22 -

entitled to respectful consideration, and * * * only strong reasons will warrant a departure from it.'"

Again, in State v. King Colony Ranch, 137 Mont. 145, 151, 350 P.2d 841:

> "The State Board of Equalization was and is warranted in following the Federal interpretation of the language which the Legislature of this state adopted from the Act of Congress."

See: Cahill-Mooney Construction Co. v. Ayres, 140 Mont. 464, 373 P.2d 703; Roberts v. Roberts, 135 Mont. 149, 338 P.2d 719; Lowe v. Root, 166 Mont. 150, 531 P.2d 674, 32 St.Rep. 122.

In determining the proper scope of judicial review of environmental impact statements under NEPA, the federal courts have framed the question in terms of whether NEPA is merely a procedural statute or whether it is a substantive statute creating substantive duties reviewable by the courts. See Note:: The Least Adverse Alternative Approach to Substantive Review under NEPA, 88 Harvard Law Review 735 (1975). However because the district court ruled on procedural grounds, we limit our inquiry to procedural matters.

The United States Supreme Court recently stated in Aberdeen & Rockfish R.R.Co. v. SCRAP, 422 U.S. 289, 95 S.Ct. 2336, 45 L ed 2d 191, 215 (1975):

> "* * * NEPA does create a discreet procedural obligation on government agencies to give written consideration of environmental issues in connection with certain major federal actions * * *."

In Calvert Cliffs', supra, (449 F.2d 1109, 1115), the District of Columbia Court of Appeals stated:

> "* * * But if the decision was reached procedurally without individualized consideration and balancing of environmental factors---conducted fully and in good faith---it is the responsibility of the courts to reverse. * * *"

- 23 -

The Ninth Circuit Court of Appeals firmly bases its reviewing standard on the federal Administrative Procedure Act. Lathan v. Brinegar, 506 F.2d 677 (1974); Cady v. Morton, 527 F.2d 786 (1975); Trout Unlimited v. Morton, 509 F.2d 1276, 1282, 1283 (1974). In Trout Unlimited the court expanded on its explanation:

> "The 'without observance of procedure required by law' §706(2)(D) standard, however, is less helpful in reviewing the sufficiency of an EIS than one might wish * * *.
>
> "* * *
>
> "It follows, therefore, that in determining whether the appellees prepared an adequate EIS we will be guided in large part by 'procedural rules' rooted in case law. * * * All such rules should be designed so as to assure that the EIS serves substantially the two basic purposes for which it was designed. That is, in our opinion an EIS is in compliance with NEPA when its form, content and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information."

We are also mindful that the policies set forth in section 69-6503, R.C.M. 1947, are to be implemented by state agencies in accordance with sections 69-6504(a) and 69-6507, R.C.M. 1947.

In light of the foregoing, the scope of judicial review of the Revised EIS in this case is limited to a consideration of whether the Department provided a sufficiently detailed consideration and balancing of environmental factors which will ensure that the procedure followed will give effect to the policies of MEPA, aid the Department in decision making, and publicize the environmental impact of its action.

- 24 -

We will consider each factor of the Revised EIS found legally deficient by the district court in the sequence set forth in its opinion.

The district court held the Department failed to include in the Revised EIS anything rising to the dignity of an economic analysis, as required by MEPA and by House Joint Resolution No. 73, approved March 16, 1974. A joint resolution is not binding as law on this Court, but we give it consideration as a clear manifestation of the legislative construction of MEPA. State v. Toomey, 135 Mont. 35, 335 P.2d 1051; State ex rel. Jones v. Erickson, 75 Mont. 429, 244 P. 287. House Joint Resolution No. 73 states in relevant part:

> "WHEREAS, it is a matter of serious concern to the legislature that this enactment [MEPA] be fully implemented in all respects,
>
> "NOW, THEREFORE, BE IT RESOLVED * * *
>
> "That all agencies of state government are hereby directed to achieve forthwith the full implementation of the Montana Environmental Policy Act including the economic analysis requirements of sections 69-6504 through 69-6514 * * * and
>
> "* * * that economic analysis shall accompany environmental impact statements as required by the foregoing sections of the act and shall encompass an analysis of the costs and benefits to whomsoever they may accrue, including considerations of employment, income, investment, energy, the social costs and benefits of growth, opportunity costs, and the distribution effects * * *."

With the exception of a discussion of educational costs, the Revised EIS contains scant economic analysis. The Department seeks to explain this away with a reference to the function of local governing bodies in compiling economic data, and states it would be a duplication of effort for the Department to so engage itself. Earlier in this opinion we discussed this attempt to circumvent the intent of MEPA as expressed by the legislature---in this instance

- 25 -

as recently as 1974. The Department may not abdicate its duties under MEPA to local governments.

The cost-benefit analysis required by MEPA, as construed by the legislature, encompasses a broad consideration of several factors categorized in House Joint Resolution No. 73, approved March 16, 1974. A reasonsonable cost-benefit economic analysis undertaken pursuant to these criteria would, in effect, accomplish most of the purposes sought to be served by an environmental impact statement. Here, for example, the Revised EIS asserts that Beaver Creek South will provide necessary housing for many employees at nearby Big Sky of Montana. This comment, however, is not accompanied by any data to support the conclusion that Big Sky employees could afford, or would desire, to live at Beaver Creek South. In other words, the Revised EIS does not consider or disclose the approximate costs of the residential units, the average incomes of Big Sky employees, or even the likelihood that this projected housing use will come to pass. Such data is contemplated by MEPA.

The Department clearly ignored its duties to provide an economic analysis in its Revised EIS, as the district court found. Also the cooperative inter- and intra-governmental approach fostered by MEPA section 69-6503, R.C.M. 1947, should encourage the free exchange of data compiled by local and state agencies; if the local government prepares an economic analysis, such could be incorporated as part of the Department's environmental impact statement.

The gist of the Revised EIS, p.23, with respect to aesthetic considerations is demonstrated by its comments on visual impact:

"A visual impact would certainly result from the proposed development. The severity of this visual impact is purely speculation, and the desirability is a matter of personal aesthetic values.

"* * *

"* * * Any development, including the proposed Beaver Creek South, placed within this scenic canyon setting would be considered aesthetically offensive by a majority of people."

Again, the Revised EIS, p. 24, affirms that visual impact is a matter of "speculation" because "Economists have not developed an acceptable process to place an economic valuation on such intangibles as aesthetics."

This latter comment betrays a fundamental weakness of the Department's approach to its responsibilities under MEPA. In decrying the absence of a precise quantitative or qualitative measure, the Department ignores the recognition of this variable factor in section 69-6504(b)(2), as one which must "be given appropriate consideration in decision making along with economic and technical considerations". (Emphasis supplied). Under section 69-6504(b)(3)(i), the Department is required to prepare a detailed statement on "the environmental impact of the proposed action" and visual impact falls within the meaning of this subsection. There is no detailed description of the design of the proposed residential units, the compatability of the architecture with the surrounding landscape, the obstruction or availability of views, or the relationship of the open spaces to these factors. The Revised EIS comments in this regard are not sufficiently detailed under any standard conceivable to give meaning to the act or inform decision makers and the public of the probable aesthetic consequences of the development.

- 27 -

Section 69-6504(b)(3)(iii), R.C.M. 1947, requires an environmental impact statement to contain "alternatives to the proposed action". Section 69-6504(b)(4), R.C.M. 1947, requires agencies to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources". The latter section appears to be operable whether or not an environmental impact statement is prepared. Trinity Episcopal School Corporation v. Romney, 8 ERC 1033, 523 F.2d 88, (2d Cir. 1975). The district court correctly concluded the subsection (b)(4) description is to be included in a subsection (b)(3) environmental impact statement.

However, the district court erred in its opinion that discussion of alternatives in the Revised EIS is "patently inadequate". The district court merely viewed the last two pages of the Revised EIS under the "Alternatives" heading, wherein various alternatives are essentially stated as conclusions. This review ignores the reasonable discussion of alternatives contained in other portions of the Revised EIS regarding such factors as water supply, wastewater, and police and fire protection. As stated by the Ninth Circuit Court of Appeals in Life of the Land v. Brinegar, 485 F.2d 460, 472 (1973):

> "NEPA's 'alternatives' discussion is subject to a construction of reasonableness. * * * Certainly, the statute should not be employed as a crutch for chronic faultfinding. Accordingly, there is no need for an EIS to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative."

The discussion of alternatives in the Revised EIS viewed in its entirety is sufficiently detailed to comply with the procedural requirements of MEPA.

The Revised EIS contains reproductions of lengthy comments from the state Department of Fish and Game and the Gallatin Sportsmen's Association regarding impact of the proposed development on wildlife in the Gallatin Canyon. Other comments are also mentioned. All of the comments indicated that an adverse environmental effect on wildlife could not be avoided if the proposal were to be implemented. Section 69-6504(b)(3)(ii), R.C.M. 1947. The Revised EIS, p. 28, rather than dealing with a consideration of these adverse effects, contains a protracted discussion of the legislative history of the Subdivision and Platting Act and the local level hearings on the instant plat proposal, and concludes by stating:

> "Therefore, there is an opportunity to effect rejection or revision of a subdivision for environmental reasons at the county level. This would appear to satisfy the spirit in which the Montana Environmental Policy Act was enacted."

We find this justification for inaction and ad hoc agency "legislating" to be inappropriate in an environmental impact statement. The Department's responsibility in pursuing its duties under MEPA is to consider all relevant environmental values along with other factors and come to a conclusion with regard to them. Although we do not suggest the Department has the internal resources and expertise with which to expand upon or refute the wildlife comments received from outside sources, we do hold it is within the Department's province under MEPA to reach its decision based upon a procedure which encompasses a consideration and balancing of environmental factors. The district court was correct in holding that the mere transmittal of comments adverse to the proposal is insufficient.

- 29 -

The department of Highways commented on the effect of the proposed subdivision with respect to traffic flow on U.S. Highway 191. The Department of Highways states the Beaver Creek South Subdivision "will generate a large amount of traffic", citing figures, and states this increased volume "will not warrant the construction of a four lane facility in this vicinity." Several challenging comments call for more detailed and accurate information, but the Revised EIS, at p. 33, states the Department of Highways reaffirms its statement and on that basis says:

> "* * * Beaver Creek South would not be the development that would make reconstruction [of the highway] necessary."

The district court found this portion of the Revised EIS lacking because the treatment of highways was "incomplete", there was no discussion of the effect of future highway construction, and also no discussion of cumulative social, economic and environmental impacts of continued development in the Gallatin Canyon.

We believe the highway discussion is procedurally adequate and that the district court's opinion on this point requires an unwarranted clairvoyance on the part of the Department. In contradistinction to the wildlife discussion where the agency with the greatest expertise in the field (Department of Fish and Game) raised serious adverse questions which were not addressed, here the Department is justified in relying on the Department of Highways projections for future traffic flow. The published comments and accompanying discussion demonstrate a reasonable consideration and balancing of environmental factors.

Comments of Montana Power Company in the Revised EIS indicate to the Department that the company would have "no problem" in supplying the electricity needs of the proposed sub-

division, and that this capacity could be met with present transmission lines. The Revised EIS notes at p. 36, that the proposed subdivision "would be a contributing factor toward any future necessity for additional service." The adverse comments to this in the Revised EIS concentrate on the issue of whether or not Montana Power Company is counting on the use of a proposed new power line into the canyon from the west. The Department's conclusion does not dispute the information provided it by the power company. The district court held that this analysis is superficial at best.

The energy needs of the Gallatin Canyon with respect to Beaver Creek South, and future development, are sufficiently considered and balanced in the Revised EIS. The Department, through its inclusion in the Revised EIS of conflicting comments, cannot be expected to provide detail beyond that which is reasonably foreseeable. The Department reasonably concluded the proposed development would contribute to the total power needs of the area and to any future necessity for additional service. This constitutes procedural compliance with MEPA in that the Departmental decision makers are made aware of the environmental consequences regarding energy, and the same information is made available to other branches of government and the public. Trout Unlimited v. Morton, 509 F.2d 1276.

The district court held that the "actual necessity" for the proposed subdivision must be analyzed. As the appellants correctly point out, there is no provision in MEPA which requires a study of necessity. Therefore, the district court's opinion on this point is erroneous.

We point out, however, the necessity of the project was gratuitously introduced into the Revised EIS by the Department in order to publish therein a letter by Big Sky of Montana, Inc.

which suggests that the Beaver Creek South subdivision will alleviate a housing shortage for employees at Big Sky. In response to several challenging comments received by the Department, the Revised EIS then reverses its earlier position by stating that the objections may be valid, but they have no bearing on whether or not to approve the plat.

This turnabout of the Department within the Revised EIS evidences an attitude that an environmental impact statement is simply window dressing to pacify opponents of the Department's actions. MEPA was not enacted to provide the government and public with project justifications by state agencies. We hold that if the Department deems the necessity of the development to be a critical factor in its analysis of the impact of the proposed subdivision, then it is bound at least to make a reasonable consideration of the necessity of the project in light of the reasonable objections made to the necessity premise.

The district court held that cumulative impacts must be discussed in greater detail. The Revised EIS contains a detailed analysis of the cumulative impact of increasing the nutrient load in the Gallatin River from the subdivision's domestic water sources. No other cumulative impacts are discussed in the same portion of the Revised EIS. However, the Revised EIS as a whole contains several references to anticipated future environmental impacts in the vicinity, and a reasonably detailed summary of the pending comprehensive plan for the Gallatin Canyon developed by the Gallatin Canyon Planning Study Committee. This constitutes a sufficiently detailed consideration and disclosure regarding "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity". Section 69-6504(b)(3)(iv), R.C.M. 1947.

In summary, the Revised EIS is procedurally inadequate in its analyses of economic costs and benefits, aesthetic considerations, and wildlife factors. This holding is not to be construed as a mandate for technical perfection; rather, we find simply that the Revised EIS does not sufficiently consider and balance the full range of environmental factors required under the terms of MEPA. If the policy and purpose of MEPA are to have any practical meaning, state agencies must perform their duties pursuant to the directives contained in that Act.

Having found that the district court correctly declared the Revised EIS to be procedurally inadequate and void, the final question is whether plaintiff Associations are entitled to injunctive relief as ordered by the district court.

The rule is well settled that injunction actions by private parties against public officials must be based upon irreparable injury and a clear showing of illegality. State ex rel. Keast v. Krieg, 145 Mont. 521, 402 P.2d 405. Environmental damage as alleged by the Associations is an injury within the scope of the judicial cognizance. Furthermore, the preceding discussion indicates the Revised EIS does not meet the minimum requirements of the law under MEPA and is clearly illegal.

The Department and Beaver Creek allege an injunction is barred by section 93-4203(4), R.C.M. 1947, which states:

> "An injunction cannot be granted:
>
> "* * *
>
> "(4) to prevent the execution of a public statute, by officers of the law, for the public benefit."

This argument overlooks the cases which hold that illegal actions by public officials may be enjoined. In Larson v. The State of Montana and the Department of Revenue, 166 Mont. 449, 534 P.2d 854, 32 St.Rep. 377, 384, this Court overruled the dicta in Keast to the effect that an injunction against public officers was banned by section 93-4203(4), stating:

> "The preferable law is enunciated in Hames
> v. City of Polson, 123 Mont. 469, 479, 215
> P.2d 950, where it was held:
>
> "'* * * public bodies and public officers may
> be restrained by injunction from proceeding
> in violation of the law, to the prejudice of
> the public, or to the injury of individual
> rights * * *.'"

We affirm the district court holding that injunctive relief is proper in this case.

The summary judgment is affirmed.

- 34 -

. . . . . . . . . . . .

_____
Justice.

Mr. Justice Gene B. Daly dissenting:

Time being short and to preclude another opinion I again dissent and comment that my original objection to legal principles concerning standing to bring suit have not been discussed nor answered.

_____
Justice.